17 U.S. 250 (____)
4 Wheat. 250
TRUSTEES OF DARTMOUTH COLLEGE
v.
WOODWARD.
Supreme Court of United States.

*266 March 10th and 11th, 1818. Webster, for the plaintiffs in error.
*298 February 2d, 1819. The opinion of the court was delivered by MARSHALL, Ch. J.
This is an action of trover, brought by the Trustees of Dartmouth College against William H. Woodward, in the state court of New Hampshire, for the book of records, corporate seal, and other corporate property, to which the plaintiffs allege themselves to be entitled. A special verdict, after setting out the rights of the parties, finds for the defendant, if certain acts of the legislature of New Hampshire, passed on the 27th of June, and on the 18th of December 1816, be valid, and binding on the trustees, without their assent, and not repugnant to the constitution of the United States; *625] otherwise, it finds for the plaintiffs. *The superior court of judicature of New Hampshire rendered a judgment upon this verdict for the defendant, which judgment has been brought before this court by writ of error. The single question now to be considered is, do the acts to which the verdict refers violate the constitution of the United States?
This court can be insensible neither to the magnitude nor delicacy of this question. The validity of a legislative act is to be examined; and the opinion of the highest law tribunal of a state is to be revised  an opinion which carries with it intrinsic evidence of the diligence, of the ability, and the integrity, with which it was formed. On more than one occasion, this court has expressed the cautious circumspection with which it approaches the consideration of such questions; and has declared, that in no doubtful case, would it pronounce a legislative act to be contrary to the constitution. But the American people have said, in the constitution of the United States, that *299 "no state shall pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts." In the same instrument, they have also said, "that the judicial power shall extend to all cases in law and equity arising under the constitution." On the judges of this court, then, is imposed the high and solemn duty of protecting, from even legislative violation, those contracts which the constitution of our country has placed beyond legislative control; and, however irksome the task may be, this is a duty from which we dare not shrink.
*The title of the plaintiffs originates in a charter dated the 13th [*626 day of December, in the year 1769, incorporating twelve persons therein mentioned, by the name of "The Trustees of Dartmouth College," granting to them and their successors the usual corporate privileges and powers, and authorizing the trustees, who are to govern the college, to fill up all vacancies which may be created in their own body.
The defendant claims under three acts of the legislature of New Hampshire, the most material of which was passed on the 27th of June 1816, and is entitled, "an act to amend the charter, and enlarge and improve the corporation of Dartmouth College." Among other alterations in the charter, this act increases the number of trustees to twenty-one, gives the appointment of the additional members to the executive of the state, and creates a board of overseers, with power to inspect and control the most important acts of the trustees. This board consists of twenty-five persons. The president of the senate, the speaker of the house of representatives, of New Hampshire, and the governor and lieutenant-governor of Vermont, for the time being, are to be members ex officio. The board is to be completed by the governor and council of New Hampshire, who are also empowered to fill all vacancies which may occur. The acts of the 18th and 26th of December are supplemental to that of the 27th of June, and are principally intended to carry that act into effect. The majority of the trustees of the college have refused to accept this amended charter, and have *brought this suit [*627 for the corporate property, which is in possession of a person holding by virtue of the acts which have been stated.
It can require no argument to prove, that the circumstances of this case constitute a contract. An application is made to the crown for a charter to incorporate a religious and literary institution. In the application, it is stated, that large contributions have been made for the object, which will be conferred on the corporation, as soon as it shall be created. The charter is granted, and on its faith the property is conveyed. Surely, in this transaction every ingredient of a complete and legitimate contract is to be found. The points for consideration are, 1. Is this contract protected by the constitution of the United States? 2. Is it impaired by the acts under which the defendant holds?
1. On the first point, is has been argued, that the word "contract," in its broadest sense, would comprehend the political relations between the government and its citizens, would extend to offices held within a state, for state purposes, and to many of those laws concerning civil institutions, which must change with circumstances, and be modified by ordinary legislation; which deeply concern the public, and which, to preserve good government, the public judgment must control. That even marriage is a contract, and its obligations are affected by the laws respecting divorces. That the clause *300 *628] in the constitution, if construed in its greatest latitude, *would prohibit these laws. Taken in its broad, unlimited sense, the clause would be an unprofitable and vexatious interference with the internal concerns of a state, would unnecessarily and unwisely embarrass its legislation, and render immutable those civil institutions, which are established for purposes of internal government, and which, to subserve those purposes, ought to vary with varying circumstances. That as the framers of the constitution could never have intended to insert in that instrument, a provision so unnecessary, so mischievous, and so repugnant to its general spirit, the term "contract" must be understood in a more limited sense. That it must be understood as intended to guard against a power, of at least doubtful utility, the abuse of which had been extensively felt; and to restrain the legislature in future from violating the right to property. That, anterior to the formation of the constitution, a course of legislation had prevailed in many, if not in all, of the states, which weakened the confidence of man in man, and embarrassed all transactions between individuals, by dispensing with a faithful performance of engagements. To correct this mischief, by restraining the power which produced it, the state legislatures were forbidden "to pass any law impairing the obligation of contracts," that is, of contracts respecting property, under which some individual could claim a right to something beneficial to himself; and that, since the clause in the constitution must in construction receive some limitation, it may be confined, and ought to be *629] confined, to cases of this *description; to cases within the mischief it was intended to remedy.
The general correctness of these observations cannot be controverted. That the framers of the constitution did not intend to restrain the states in the regulation of their civil institutions, adopted for internal government, and that the instrument they have given us, is not to be so construed, may be admitted. The provision of the constitution never has been understood to embrace other contracts, than those which respect property, or some object of value, and confer rights which may be asserted in a court of justice. It never has been understood to restrict the general right of the legislature to legislate on the subject of divorces. Those acts enable some tribunals, not to impair a marriage contract, but to liberate one of the parties, because it has been broken by the other. When any state legislature shall pass an act annulling all marriage contracts, or allowing either party to annul it, without the consent of the other, it will be time enough to inquire, whether such an act be constitutional.
The parties in this case differ less on general principles, less on the true construction of the constitution in the abstract, than on the application of those principles to this case, and on the true construction of the charter of 1769. This is the point on which the cause essentially depends. If the act of incorporation be a grant of political power, if it create a civil institution, to be employed in the administration of the government, or if the funds of *630] the college be *public property, or if the state of New Hampshire, as a government, be alone interested in its transactions, the subject is one in which the legislature of the state may act according to its own judgment, *301 unrestrained by any limitation of its power imposed by the constitution of the United States.
But if this be a private eleemosynary institution, endowed with a capacity to take property, for objects unconnected with government, whose funds are bestowed by individuals, on the faith of the charter; if the donors have stipulated for the future disposition and management of those funds, in the manner prescribed by themselves; there may be more difficulty in the case, although neither the persons who have made these stipulations, nor those for whose benefit they were made, should be parties to the cause. Those who are no longer interested in the property, may yet retain such an interest in the preservation of their own arrangements, as to have a right to insist, that those arrangements shall be held sacred. Or, if they have themselves disappeared, it becomes a subject of serious and anxious inquiry, whether those whom they have legally empowered to represent them for ever, may not assert all the rights which they possessed, while in being; whether, if they be without personal representatives, who may feel injured by a violation of the compact, the trustees be not so completely their representatives, in the eye of the law, as to stand in their place, not only as respects the government of the college, but also as respects the maintenance of the college charter. It becomes then the duty of the court, most *seriously to examine this charter, and to ascertain its true character. [*631
From the instrument itself, it appears, that about the year 1754, the Rev. Eleazer Wheelock established, at his own expense, and on his own estate, a charity school for the instruction of Indians in the Christian religion. The success of this institution inspired him with the design of soliciting contributions in England, for carrying on and extending his undertaking. In this pious work, he employed the Rev. Nathaniel Whitaker, who, by virtue of a power of attorney from Dr. Wheelock, appointed the Earl of Dartmouth and others, trustees of the money, which had been, and should be, contributed; which appointment Dr. Wheelock confirmed by a deed of trust, authorizing the trustees to fix on a site for the college. They determined to establish the school on Connecticut river, in the western part of New Hampshire; that situation being supposed favorable for carrying on the original design among the Indians, and also for promoting learning among the English; and the proprietors in the neighborhood having made large offers of land, on condition, that the college should there be placed. Dr. Wheelock then applied to the crown for an act of incorporation; and represented the expediency of appointing those whom he had, by his last will, named as trustees in America, to be members of the proposed corporation. "In consideration of the premises," "for the education and instruction of the youth of the Indian tribes," &c., "and also of English youth, and any others," the charter was granted, and the trustees of Dartmouth College were, by that name, created a body *corporate, with power, for [*632 the use of the said college, to acquire real and personal property, and to pay the president, tutors and other officers of the college, such salaries as they shall allow.
The charter proceeds to appoint Eleazer Wheelock, "the founder of said college," president thereof, with power, by his last will, to appoint a successor, who is to continue in office, until disapproved by the trustees. In case *302 of vacancy, the trustees may appoint a president, and in case of the ceasing of a president, the senior professor or tutor, being one of the trustees, shall exercise the office, until an appointment shall be made. The trustees have power to appoint and displace professors, tutors and other officers, and to supply any vacancies which may be created in their own body, by death, resignation, removal or disability; and also to make orders, ordinances and laws for the government of the college, the same not being repugnant to the laws of Great Britain, or of New Hampshire, and not excluding any person on account of his speculative sentiments in religion, or his being of a religious profession different from that of the trustees. This charter was accepted, and the property, both real and personal, which had been contributed for the benefit of the college, was conveyed to, and vested in, the corporate body.
From this brief review of the most essential parts of the charter, it is apparent, that the funds of the college consisted entirely of private donations. It is, perhaps, not very important, who were the donors. The probability is, that the Earl of Dartmouth, and the other trustees in England, were, in *633] fact, the largest *contributors. Yet the legal conclusion, from the facts recited in the charter, would probably be, that Dr. Wheelock was the founder of the college. The origin of the institution was, undoubtedly, the Indian charity school, established by Dr. Wheelock, at his own expense. It was at his instance, and to enlarge this school, that contributions were solicited in England. The person soliciting these contributions was his agent; and the trustees, who received the money, were appointed by, and act under, his authority. It is not too much to say, that the funds were obtained by him, in trust, to be applied by him to the purposes of his enlarged school. The charter of incorporation was granted at his instance. The persons named by him, in his last will, as the trustees of his charity-school, compose a part of the corporation, and he is declared to be the founder of the college, and its president for life. Were the inquiry material, we should feel some hesitation in saying, that Dr. Wheelock was not, in law, to be considered as the founder (1 Bl. Com. 481) of this institution, and as possessing all the rights appertaining to that character. But be this as it may, Dartmouth College is really endowed by private individuals, who have bestowed their funds for the propagation of the Christian religion among the Indians, and for the promotion of piety and learning generally. From these funds, the salaries of the tutors are drawn; and these salaries lessen the expense *634] of education to the students. It *is then an eleemosynary (1 Bl. Com. 471), and so far as respects its funds, a private corporation.
Do its objects stamp on it a different character? Are the trustees and professors public officers, invested with any portion of political power, partaking in any degree in the administration of civil government, and performing duties which flow from the sovereign authority? That education is an object of national concern, and a proper subject of legislation, all admit. That there may be an institution, founded by government, and placed entirely under its immediate control, the officers of which would be public officers, amenable exclusively to government, none will deny. But is Dartmouth College such an institution? Is education altogether in the hands of government? Does every teacher of youth become a public officer, and do donations for the purpose of education necessarily become public property, *303 so far that the will of the legislature, not the will of the donor, becomes the law of the donation? These questions are of serious moment to society, and deserve to be well considered.
Doctor Wheelock, as the keeper of his charity-school, instructing the Indians in the art of reading, and in our holy religion; sustaining them at his own expense, and on the voluntary contributions of the charitable, could scarcely be considered as a public officer, exercising any portion of those duties which belong to government; nor could the legislature have *supposed, that his private funds, or those given by others, were subject [*635 to legislative management, because they were applied to the purposes of education. When, afterwards, his school was enlarged, and the liberal contributions made in England, and in America, enabled him to extend his care to the education of the youth of his own country, no change was wrought in his own character, or in the nature of his duties. Had he employed assistant-tutors with the funds contributed by others, or had the trustees in England established a school, with Dr. Wheelock at its head, and paid salaries to him and his assistants, they would still have been private tutors; and the fact, that they were employed in the education of youth, could not have converted them into public officers, concerned in the administration of public duties, or have given the legislature a right to interfere in the management of the fund. The trustees, in whose care that fund was placed by the contributors, would have been permitted to execute their trust, uncontrolled by legislative authority.
Whence, then, can be derived the idea, that Dartmouth College has become a public institution, and its trustees public officers, exercising powers conferred by the public for public objects? Not from the source whence its funds were drawn; for its foundation is purely private and eleemosynary  not from the application of those funds; for money may be given for education, and the persons receiving it do not, by being employed in the education of youth, become members of the civil government. Is it from *the [*636 act of incorporation? Let this subject be considered.
A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law. Being the mere creature of law, it possesses only those properties which the charter of its creation confers upon it, either expressly, or as incidental to its very existence. These are such as are supposed best calculated to effect the object for which it was created. Among the most important are immortality, and, if the expression may be allowed, individuality; properties, by which a perpetual succession of many persons are considered as the same, and may act as a single individual. They enable a corporation to manage its own affairs, and to hold property, without the perplexing intricacies, the hazardous and endless necessity, of perpetual conveyances for the purpose of transmitting it from hand to hand. It is chiefly for the purpose of clothing bodies of men, in succession, with these qualities and capacities, that corporations were invented, and are in use. By these means, a perpetual succession of individuals are capable of acting for the promotion of the particular object, like one immortal being. But this being does not share in the civil government of the country, unless that be the purpose for which it was created. Its immortality no more confers on it political power, or a political character, than immortality would confer such power or character on a natural person. It is no more a state instrument, *304 than a natural person exercising the same powers would be. If, then, a *637] natural person, employed *by individuals in the education of youth, or for the government of a seminary in which youth is educated, would not become a public officer, or be considered as a member of the civil government, how is it, that this artificial being, created by law, for the purpose of being employed by the same individuals, for the same purposes, should become a part of the civil government of the country? Is it because its existence, its capacities, its powers, are given by law? Because the government has given it the power to take and to hold property, in a particular form, and for particular purposes, has the government a consequent right substantially to change that form, or to vary the purposes to which the property is to be applied? This principle has never been asserted or recognised, and is supported by no authority. Can it derive aid from reason?
The objects for which a corporation is created are universally such as the government wishes to promote. They are deemed beneficial to the country; and this benefit constitutes the consideration, and in most cases, the sole consideration of the grant. In most eleemosynary institutions, the object would be difficult, perhaps unattainable, without the aid of a charter of incorporation. Charitable or public-spirited individuals, desirous of making permanent appropriations for charitable or other useful purposes, find it impossible to effect their design securely and certainly, without an incorporating act. They apply to the government, state their beneficent object, and offer to *638] advance the money necessary for its accomplishment, *provided the government will confer on the instrument which is to execute their designs the capacity to execute them. The proposition is considered and approved. The benefit to the public is considered as an ample compensation for the faculty it confers, and the corporation is created. If the advantages to the public constitute a full compensation for the faculty it gives, there can be no reason for exacting a further compensation, by claiming a right to exercise over this artificial being, a power which changes its nature, and touches the fund, for the security and application of which it was created. There can be no reason for implying in a charter, given for a valuable consideration, a power which is not only not expressed, but is in direct contradiction to its express stipulations.
From the fact, then, that a charter of incorporation has been granted, nothing can be inferred, which changes the character of the institution, or transfers to the government any new power over it. The character of civil institutions does not grow out of their incorporation, but out of the manner in which they are formed, and the objects for which they are created. The right to change them is not founded on their being incorporated, but on their being the instruments of government, created for its purposes. The same institutions, created for the same objects, though not incorporated, would be public institutions, and, of course, be controllable by the legislature. The incorporating act neither gives nor prevents this control. Neither, *639] in reason, can the incorporating act *change the character of a private eleemosynary institution.
We are next led to the inquiry, for whose benefit the property given to Dartmouth College was secured? The counsel for the defendant have insisted, that the beneficial interest is in the people of New Hampshire. The charter, after reciting the preliminary measures which had been taken, and *305 the application for an act of incorporation, proceeds thus: "Know ye, therefore, that we, considering the premises, and being willing to encourage the laudable and charitable design of spreading Christian knowledge among the savages of our American wilderness, and also that the best means of education be established in our province of New Hampshire, for the benefit of said province, do, of our special grace," &c. Do these expressions bestow on New Hampshire any exclusive right to the property of the college, any exclusive interest in the labors of the professors? Or do they merely indicate a willingness that New Hampshire should enjoy those advantages which result to all from the establishment of a seminary of learning in the neighborhood? On this point, we think it impossible to entertain a serious doubt. The words themselves, unexplained by the context, indicate, that the "benefit intended for the province" is that which is derived from "establishing the best means of education therein;" that is, from establishing in the province, Dartmouth College, as constituted by the charter. But, if these words, considered alone, could admit of doubt, that *doubt is completely [*640 removed, by an inspection of the entire instrument.
The particular interests of New Hampshire never entered into the mind of the donors, never constituted a motive for their donation. The propagation of the Christian religion among the savages, and the dissemination of useful knowledge among the youth of the country, were the avowed and the sole objects of their contributions. In these, New Hampshire would participate; but nothing particular or exclusive was intended for her. Even the site of the college was selected, not for the sake of New Hampshire, but because it was "most subservient to the great ends in view," and because liberal donations of land were offered by the proprietors, on condition that the institution should be there established. The real advantages from the location of the college, are, perhaps, not less considerable to those on the west, than to those on the east side of Connecticut river. The clause which constitutes the incorporation, and expresses the objects for which it was made, declares those objects to be the instruction of the Indians, "and also of English youth, and any others." So that the objects of the contributors, and the incorporating act, were the same; the promotion of Christianity, and of education generally, not the interests of New Hampshire particularly.
From this review of the charter, it appears, that Dartmouth College is an eleemosynary institution, incorporated for the purpose of perpetuating the application of the bounty of the donors, to the specified objects of that bounty; that its trustees or governors *were originally named by the [*641 founder, and invested with the power of perpetuating themselves; that they are not public officers, nor is it a civil institution, participating in the administration of government; but a charity-school, or a seminary of education, incorporated for the preservation of its property, and the perpetual application of that property to the objects of its creation.
Yet a question remains to be considered, of more real difficulty, on which more doubt has been entertained, than on all that have been discussed. The founders of the college, at least, those whose contributions were in money, have parted with the property bestowed upon it, and their representatives have no interest in that property. The donors of land are equally without interest, so long as the corporation shall exist. Could they be found, they *306 are unaffected by any alteration in its constitution, and probably regardless of its form, or even of its existence. The students are fluctuating, and no individual among our youth has a vested interest in the institution, which can be asserted in a court of justice. Neither the founders of the college, nor the youth for whose benefit it was founded, complain of the alteration made in its charter, or think themselves injured by it. The trustees alone complain, and the trustees have no beneficial interest to be protected. Can this be such a contract, as the constitution intended to withdraw from the power of state legislation? Contracts, the parties to which have a vested beneficial interest, and those only, it has been said, are the objects about *642] *which the constitution is solicitous, and to which its protection is extended.
The court has bestowed on this argument the most deliberate consideration, and the result will be stated. Dr. Wheelock, acting for himself, and for those who, at his solicitation, had made contributions to his school, applied for this charter, as the instrument which should enable him, and them, to perpetuate their beneficent intention. It was granted. An artificial, immortal being, was created by the crown, capable of receiving and distributing for ever, according to the will of the donors, the donations which should be made to it. On this being, the contributions which had been collected were immediately bestowed. These gifts were made, not indeed to make a profit for the donors, or their posterity, but for something, in their opinion, of inestimable value; for something which they deemed a full equivalent for the money with which it was purchased. The consideration for which they stipulated, is the perpetual application of the fund to its object, in the mode prescribed by themselves. Their descendants may take no interest in the preservation of this consideration. But in this respect their descendants are not their representatives; they are represented by the corporation. The corporation is the assignee of their rights, stands in their place, and distributes their bounty, as they would themselves have distributed it, had they been immortal. So, with respect to the students who are to derive learning from this source; the corporation is a trustee for *643] them also. Their potential rights, which, taken distributively, *are imperceptible, amount collectively to a most important interest. These are, in the aggregate, to be exercised, asserted and protected, by the corporation. They were as completely out of the donors, at the instant of their being vested in the corporation, and as incapable of being asserted by the students, as at present.
According to the theory of the British constitution, their parliament is omnipotent. To annul corporate rights might give a shock to public opinion, which that government has chosen to avoid; but its power is not questioned. Had parliament, immediately after the emanation of this charter, and the execution of those conveyances which followed it, annulled the instrument, so that the living donors would have witnessed the disappointment of their hopes, the perfidy of the transaction would have been universally acknowledged. Yet, then, as now, the donors would have no interest in the property; then, as now, those who might be students would have had no rights to be violated; then, as now, it might be said, that the trustees, in whom the rights of all were combined, possessed no private, individual, beneficial interests in the property confided to their protection. Yet the *307 contract would, at that time, have been deemed sacred by all. What has since occurred, to strip it of its inviolability? Circumstances have not changed it. In reason, in justice, and in law, it is now, what is was in 1769.
This is plainly a contract to which the donors, the trustees and the crown (to whose rights and obligations New Hampshire succeeds) were the original *parties. It is a contract made on a valuable consideration. [*644 It is a contract for the security and disposition of property. It is a contract, on the faith of which, real and personal estate has been conveyed to the corporation. It is, then, a contract within the letter of the constitution, and within its spirit also, unless the fact, that the property is invested by the donors in trustees, for the promotion of religion and education, for the benefit of persons who are perpetually changing, though the objects remain the same, shall create a particular exception, taking this case out of the prohibition contained in the constitution.
It is more than possible, that the preservation of rights of this description was not particularly in the view of the framers of the constitution, when the clause under consideration was introduced into that instrument. It is probable, that interferences of more frequent occurrence, to which the temptation was stronger, and of which the mischief was more extensive, constituted the great motive for imposing this restriction on the state legislatures. But although a particular and a rare case may not, in itself, be of sufficient magnitude to induce a rule, yet it must be governed by the rule, when established, unless some plain and strong reason for excluding it can be given. It is not enough to say, that this particular case was not in the mind of the convention, when the article was framed, nor of the American people, when it was adopted. It is necessary to go further, and to say that, had this particular case been suggested, the language would have been so varied, as to exclude it, or it would have been made a special exception. The *case being within the words of the rule, must be within its operation [*645 likewise, unless there be something in the literal construction, so obviously absurd or mischievous, or repugnant to the general spirit of the instrument, as to justify those who expound the constitution in making it an exception.
On what safe and intelligible ground, can this exception stand? There is no expression in the constitution, no sentiment delivered by its contemporaneous expounders, which would justify us in making it. In the absence of all authority of this kind, is there, in the nature and reason of the case itself, that which would sustain a construction of the constitution, not warranted by its words? Are contracts of this description of a character to excite so little interest, that we must exclude them from the provisions of the constitution, as being unworthy of the attention of those who framed the instrument? Or does public policy so imperiously demand their remaining exposed to legislative alteration, as to compel us, or rather permit us, to say, that these words, which were introduced to give stability to contracts, and which in their plain import comprehend this contract, must yet be so construed as to exclude it?
Almost all eleemosynary corporations, those which are created for the promotion of religion, of charity or of education, are of the same character. The law of this case is the law of all. In every literary or charitable institution, unless the objects of the bounty be themselves incorporated, the *308 whole legal interest is in trustees, and can be asserted only by them. The *646] donors, or claimants of the bounty, if *they can appear in court at all, can appear only to complain of the trustees. In all other situations, they are identified with, and personated by, the trustees; and their rights are to be defended and maintained by them. Religion, charity and education are, in the law of England, legatees or donees, capable of receiving bequests or donations in this form. They appear in court, and claim or defend by the corporation. Are they of so little estimation in the United States, that contracts for their benefit must be excluded from the protection of words, which in their natural import include them? Or do such contracts so necessarily require new modelling by the authority of the legislature, that the ordinary rules of construction must be disregarded, in order to leave them exposed to legislative alteration?
All feel, that these objects are not deemed unimportant in the United States. The interest which this case has excited, proves that they are not. The framers of the constitution did not deem them unworthy of its care and protection. They have, though in a different mode, manifested their respect for science, by reserving to the government of the Union the power "to promote the progress of science and useful arts, by securing for limited times, to authors and inventors, the exclusive right to their respective writings and discoveries." They have, so far, withdrawn science, and the useful arts, from the action of the state governments. Why then should they be supposed so regardless of contracts made for the advancement of literature, as to intend to exclude them from provisions, made for the security *647] *of ordinary contracts between man and man? No reason for making this supposition is perceived.
If the insignificance of the object does not require that we should exclude contracts respecting it from the protection of the constitution; neither, as we conceive, is the policy of leaving them subject to legislative alteration so apparent, as to require a forced construction of that instrument, in order to effect it. These eleemosynary institutions do not fill the place, which would otherwise be occupied by government, but that which would otherwise remain vacant. They are complete acquisitions to literature. They are donations to education; donations, which any government must be disposed rather to encourage than to discountenance. It requires no very critical examination of the human mind, to enable us to determine, that one great inducement to these gifts is the conviction felt by the giver, that the disposition he makes of them is immutable. It is probable, that no man ever was, and that no man ever will be, the founder of a college, believing at the time, that an act of incorporation constitutes no security for the institution; believing, that it is immediately to be deemed a public institution, whose funds are to be governed and applied, not by the will of the donor, but by the will of the legislature. All such gifts are made in the pleasing, perhaps, delusive hope, that the charity will flow for ever in the channel which the givers have marked out for it. If every man finds in his own bosom strong evidence of the universality of this sentiment, there can be but little reason *648] to imagine, that the framers of our constitution were *strangers to it, and that, feeling the necessity and policy of giving permanence and security to contracts, of withdrawing them from the influence of legislative bodies, whose fluctuating policy, and repeated interferences, produced the *309 most perplexing and injurious embarrassments, they still deemed it necessary to leave these contracts subject to those interferences. The motives for such an exception must be very powerful, to justify the construction which makes it.
The motives suggested at the bar grow out of the original appointment of the trustees, which is supposed to have been in a spirit hostile to the genius of our government, and the presumption, that if allowed to continue themselves, they now are, and must remain for ever, what they originally were. Hence is inferred the necessity of applying to this corporation, and to other similar corporations, the correcting and improving hand of the legislature. It has been urged repeatedly, and certainly with a degree of earnestness which attracted attention, that the trustees, deriving their power from a regal source, must, necessarily, partake of the spirit of their origin; and that their first principles, unimproved by that resplendent light which has been shed around them, must continue to govern the college, and to guide the students.
Before we inquire into the influence which this argument ought to have on the constitutional question, it may not be amiss to examine the fact on which it rests. The first trustees were undoubtedly named in the charter, by the crown; but at whose suggestion were they named? By whom were they *selected? The charter informs us. Dr. Wheelock had represented, [*649 "that for many weighty reasons, it would be expedient, that the gentlemen whom he had already nominated, in his last will, to be trustees in America, should be of the corporation now proposed." When, afterwards, the trustees are named in the charter, can it be doubted, that the persons mentioned by Dr. Wheelock in his will were appointed? Some were probably added by the crown, with the approbation of Dr. Wheelock. Among these, is the doctor himself. If any others were appointed, at the instance of the crown, they are the governor, three members of the council, and the speaker of the house of representatives of the colony of New Hampshire. The stations filled by these persons ought to rescue them from any other imputation than too great a dependence on the crown. If, in the revolution that followed, they acted under the influence of this sentiment, they must have ceased to be trustees; if they took part with their countrymen, the imputation, which suspicion might excite, would no longer attach to them. The original trustees, then, or most of them, were named by Dr. Wheelock, and those who were added to his nomination, most probably, with his approbation, were among the most eminent and respectable individuals in New Hampshire.
The only evidence which we possess of the character of Dr. Wheelock is furnished by this charter. The judicious means employed for the accomplishment of his object, and the success which attended his endeavors, would lead to the opinion, that he united a sound understanding to that humanity and *benevolence which suggested his undertaking. It surely cannot [*650 be assumed, that his trustees were selected without judgment. With as little probability can it be assumed, that while the light of science, and of liberal principles, pervades the whole community, these originally benighted trustees remain in utter darkness, incapable of participating in the general improvement; that while the human race is rapidly advancing, they are stationary. Reasoning à priori, we should believe, that learned and *310 intelligent men, selected by its patrons for the government of a literary institution, would select learned and intelligent men for their successors; men as well fitted for the government of a college as those who might be chosen by other means. Should this reasoning ever prove erroneous, in a particular case, public opinion, as has been stated at the bar, would correct the institution. The mere possibility of the contrary would not justify a construction of the constitution, which should exclude these contracts from the protection of a provision whose terms comprehend them.
The opinion of the court, after mature deliberation, is, that this is a contract, the obligation of which cannot be impaired, without violating the constitution of the United States. This opinion appears to us to be equally supported by reason, and by the former decisions of this court.
2. We next proceed to the inquiry, whether its obligation has been impaired by those acts of the legislature of New Hampshire, to which the special verdict refers?
*651] *From the review of this charter, which has been taken, it appears that the whole power of governing the college, of appointing and removing tutors, of fixing their salaries, of directing the course of study to be pursued by the students, and of filling up vacancies created in their own body, was vested in the trustees. On the part of the crown, it was expressly stipulated, that this corporation, thus constituted, should continue for ever; and that the number of trustees should for ever consist of twelve, and no more. By this contract, the crown was bound, and could have made no violent alteration in its essential terms, without impairing its obligation.
By the revolution, the duties, as well as the powers, of government devolved on the people of New Hampshire. It is admitted, that among the latter was comprehended the transcendent power of parliament, as well as that of the executive department. It is too clear, to require the support of argument, that all contracts and rights respecting property, remained unchanged by the revolution. The obligations, then, which were created by the charter to Dartmouth College, were the same in the new, that they had been in the old government. The power of the government was also the same. A repeal of this charter, at any time prior to the adoption of the present constitution of the United States, would have been an extraordinary and unprecedented act of power, but one which could have been contested only by the restrictions upon the legislature, to be found in the constitution of the state. But the constitution of the United States has imposed this *652] additional limitation, *that the legislature of a state shall pass no act "impairing the obligation of contracts."
It has been already stated, that the act "to amend the charter, and enlarge and improve the corporation of Dartmouth College," increases the number of trustees to twenty-one, gives the appointment of the additional members to the executive of the state, and creates a board of overseers, to consist of twenty-five persons, of whom twenty-one are also appointed by the executive of New Hampshire, who have power to inspect and control the most important acts of the trustees.
On the effect of this law, two opinions cannot be entertained. Between acting directly, and acting through the agency of trustees and overseers, no essential difference is perceived. The whole power of governing the college is transferred from trustees, appointed according to the will of the founder, *311 expressed in the charter, to the executive of New Hampshire. The management and application of the funds of this eleemosynary institution, which are placed by the donors in the hands of trustees named in the charter, and empowered to perpetuate themselves, are placed by this act under the control of the government of the state. The will of the state is substituted for the will of the donors, in every essential operation of the college. This is not an immaterial change. The founders of the college contracted, not merely for the perpetual application of the funds which they gave, to the objects for which those funds were given; they contracted also, to secure that application by the constitution of the corporation. *They contracted [*653 for a system, which should, so far as human foresight can provide, retain for ever the government of the literary institution they had formed, in the hands of persons approved by themselves. This system is totally changed. The charter of 1769 exists no longer. It is re-organized; and re-organized in such a manner, as to convert a literary institution, moulded according to the will of its founders, and placed under the control of private literary men, into a machine entirely subservient to the will of government. This may be for the advantage of this college in particular, and may be for the advantage of literature in general; but it is not according to the will of the donors, and is subversive of that contract, on the faith of which their property was given.
In the view which has been taken of this interesting case, the court has confined itself to the rights possessed by the trustees, as the assignees and representatives of the donors and founders, for the benefit of religion and literature. Yet, it is not clear, that the trustees ought to be considered as destitute of such beneficial interest in themselves, as the law may respect. In addition to their being the legal owners of the property, and to their having a freehold right in the powers confided to them, the charter itself countenances the idea, that trustees may also be tutors, with salaries. The first president was one of the original trustees; and the charter provides, that in case of vacancy in that office, "the senior professor or tutor, being one of the trustees, shall exercise the office of president, until the trustees shall make choice *of, and appoint a president." According to the tenor of [*654 the charter, then, the trustees might, without impropriety, appoint a president and other professors from their own body. This is a power not entirely unconnected with an interest. Even if the proposition of the counsel for the defendant were sustained; if it were admitted, that those contracts only are protected by the constitution, a beneficial interest in which is vested in the party, who appears in court to assert that interest; yet it is by no means clear, that the trustees of Dartmouth College have no beneficial interest in themselves. But the court has deemed it unnecessary to investigate this particular point, being of opinion, on general principles, that in these private eleemosynary institutions, the body corporate, as possessing the whole legal and equitable interest, and completely representing the donors, for the purpose of executing the trust, has rights which are protected by the constitution.
It results from this opinion, that the acts of the legislature of New Hampshire, which are stated in the special verdict found in this cause, are repugnant to the constitution of the United States; and that the judgment *312 on this special verdict ought to have been for the plaintiffs. The judgment of the state court must, therefore, be reversed.
WASHINGTON, Justice.
This cause turns upon the validity of certain laws of the state of New Hampshire, which have been stated in the case, and *655] which, it is contended by the counsel for the plaintiffs *in error, are void, being repugnant to the constitution of that state, and also to the constitution of the United States. Whether the first objection to these laws be well founded or not, is a question with which this court, in this case, has nothing to do: because it has no jurisdiction, as an appellate court, over the decisions of a state court, except in cases where is drawn in question the validity of a treaty, or statute of, or an authority exercised under, the United States, and the decision is against their validity; or where is drawn in question the validity of a statute of, or an authority exercised under, any state, on the ground of their being repugnant to the constitution, treaties or laws of the United States, and the decision is in favor of their validity; or where is drawn in question the construction of any clause of the constitution, or of a treaty, or statute of, or commission held under, the United States, and the decision is against the title, right, privilege or exemption specially set up of claimed by either party, under such clause of the said constitution, treaty, statute or commission.
The clause in the constitution of the United States which was drawn in question in the court from whence this transcript has been sent, is that part of the tenth section of the first article, which declares, that "no state shall pass any bill of attainder, ex post facto law, or any law impairing the obligation of contracts." The decision of the state court is against the title specially claimed by the plaintiffs in error, under the above clause, because they contend, that the laws of New Hampshire, above referred to, *656] *impair the obligation of a contract, and are, consequently, repugnant to the above clause of the constitution of the United States, and void. There are, then, two questions for this court to decide: 1st. Is the charter granted to Dartmouth College on the 13th of December 1769, to be considered as a contract? If it be, then, 2d. Do the laws in question impair its obligation?
1. What is a contract? It may be defined to be a transaction between two or more persons, in which each party comes under an obligation to the other, and each reciprocally acquires a right to whatever is promised by the other. Powell on Cont. 6. Under this definition, says Mr. Powell, it is obvious, that every feoffment, gift, grant, agreement, promise, &c., may be included, because in all there is a mutual consent of the minds of the parties concerned in them, upon an agreement between them respecting some property or right that is the object of the stipulation. He adds, that the ingredients requisite to form a contract, are, parties, consent, and an obligation to be created or dissolved: these must all concur, because the regular effect of all contracts is, on one side, to acquire, and on the other, to part with, some property or rights; or to abridge, or to restrain natural liberty, by binding the parties to do, or restraining them from doing, something which before they might have done, or omitted. If a doubt could exist that a grant is a contract, the point was decided in the case of Fletcher v. *657] Peck, 6 Cranch 87, *in which it was laid down, that a contract is either *313 executory or executed; by the former, a party binds himself to do, or not to do, a particular thing; the latter is one in which the object of the contract is performed, and this differs in nothing from a grant; but whether executed or executory, they both contain obligations binding on the parties, and both are equally within the provisions of the constitution of the United States, which forbids the state governments to pass laws impairing the obligation of contracts.
If, then, a grant be a contract, within the meaning of the constitution of the United States, the next inquiry is, whether the creation of a corporation by charter, be such a grant, as includes an obligation of the nature of a contract, which no state legislature can pass laws to impair? A corporation is defined by Mr. Justice Blackstone (2 Bl. Com. 37) to be a franchise. It is, says he, "a franchise for a number of persons, to be incorporated and exist as a body politic, with a power to maintain perpetual succession, and to do corporate acts, and each individual of such corporation is also said to have a franchise or freedom." This franchise, like other franchises, is an incorporeal hereditament, issuing out of something real or personal, or concerning or annexed to, and exercisable within a thing corporate. To this grant, or this franchise, the parties are the king and the persons for whose benefit it is created, or trustees for them. The assent of both is necessary. *The [*658 subjects of the grant are not only privileges and immunities, but property, or, which is the same thing, a capacity to acquire and to hold property in perpetuity. Certain obligations are created, binding both on the grantor and the grantees. On the part of the former, it amounts to an extinguishment of the king's prerogative to bestow the same identical franchise on another corporate body, because it would prejudice his prior grant, (2 Bl. Com. 37.) It implies, therefore, a contract not to re-assert the right to grant the franchise to another, or to impair it. There is also an implied contract, that the founder of a private charity, or his heirs, or other persons appointed by him for that purpose, shall have the right to visit and to govern the corporation, of which he is the acknowledged founder and patron, and also, that in case of its dissolution, the reversionary right of the founder to the property, with which he had endowed it, should be preserved inviolate.
The rights acquired by the other contracting party are those of having perpetual succession, of suing and being sued, of purchasing lands for the benefit of themselves and their successors, and of having a common seal, and of making by-laws. The obligation imposed upon them, and which forms the consideration of the grant is that of acting up to the end or design for which they were created by their founder. Mr. Justice BULLER, in the case of the King v. Pasmore, 3 T.R. 246, says, that the grant of incorporation is a compact between the crown and a number of persons, the latter of whom undertake, in consideration *of the privileges bestowed, to exert themselves [*659 for the good government of the place. If they fail to perform their part of it, there is an end of the compact. The charter of a corporation, says Mr. Justice Blackstone (2 Bl. Com. 484), may be forfeited through negligence, or abuse of its franchises, in which case, the law judges, that the body politic has broken the condition upon which it was incorporated, and thereupon the corporation is void. It appears to me, upon the whole, that *314 these principles and authorities prove, incontrovertibly, that a charter of incorporation is a contract.
2. The next question is, do the acts of the legislature of New Hampshire of the 27th of June, and 18th and 26th of December 1816, impair this contract, within the true intent and meaning of the constitution of the United States? Previous to the examination of this question, it will be proper clearly to mark the distinction between the different kinds of lay aggregate corporations, in order to prevent any implied decision by this court of any other case, than the one immediately before it.
We are informed, by the case of Philips v. Bury, 1 Ld. Raym. 5; s.c. 2 T.R. 346, which contains all the doctrine of corporations connected with this point, that there are two kinds of corporations aggregate, viz., such as are for public government, and such as are for private charity. The first are those for the government of a town, city or the like; and being for *660] public advantage, are *to be governed according to the law of the land. The validity and justice of their private laws and constitutions are examinable in the king's courts. Of these, there are no particular founders, and consequently, no particular visitor; there are no patrons of these corporations. But private and particular corporations for charity, founded and endowed by private persons, are subject to the private government of those who erect them, and are to be visited by them or their heirs, or such other persons as they may appoint. The only rules for the government of these private corporations are the laws and constitutions assigned by the founder. This right of government and visitation arises from the property which the founder had in the lands assigned to support the charity; and as he is the author of the charity, the law invests him with the necessary power of inspecting and regulating it. The authorities are full, to prove, that a college is a private charity, as well as an hospital, and that there is, in reality, no difference between them, except in degree; but they are within the same reason, and both eleemosynary.
These corporations, civil and eleemosynary, which differ from each other so especially in their nature and constitution, may very well differ in matters which concern their rights and privileges, and their existence and subjection to public control. The one is the mere creature of public institution, created exclusively for the public advantage, without other endowments than such as the king, or government, may bestow upon it, and having no other founder *661] or visitor than the king or government, the fundator incipiens. *The validity and justice of its laws and constitution are examinable by the courts having jurisdiction over them; and they are subject to the general law of the land. It would seem reasonable, that such a corporation may be controlled, and its constitution altered and amended by the government, in such manner as the public interest may require. Such legislative interferences cannot be said to impair the contract by which the corporation was formed, because there is, in reality, but one party to it, the trustees or governors of the corporation being merely the trustees for the public, the cestui que trust of the foundation. These trustees or governors have no interest, no privileges or immunities, which are violated by such interference, and can have no more right to complain of them, than an ordinary trustee, who is called upon in a court of equity to execute the trust. They accepted the charter, for the public benefit alone, and there would seem to be no *315 reason, why the government, under proper limitations, should not alter or modify such a grant, at pleasure. But the case of a private corporation is entirely different. That is the creature of private benefaction, for a charity or private purpose. It is endowed and founded by private persons, and subject to their control, laws and visitation, and not to the general control of the government; and all these powers, rights and privileges flow from the property of the founder in the funds assigned for the support of the charity. Although the king, by the grant of the charter, is, in some sense, the founder of all eleemosynary corporations, because, without his grant, they cannot exist; yet the patron or endower is the perficient founder, to whom belongs, as of right, all the powers and privileges, which [*662 have been described. With such a corporation, it is not competent for the legislature to interfere. It is a franchise, or incorporeal hereditament, founded upon private property, devoted by its patron to a private charity, of a peculiar kind, the offspring of his own will and pleasure, to be managed and visited by persons of his own appointment, according to such laws and regulations as he, or the persons so selected, may ordain.
It has been shown, that the charter is a contract on the part of the government, that the property with which the charity is endowed, shall be for ever vested in a certain number of persons, and their successors, to subserve the particular purposes designated by the founder, and to be managed in a particular way. If a law increases or diminishes the number of the trustees, they are not the persons which the grantor agreed should be the managers of the fund. If it appropriate the fund intended for the support of a particular charity, to that of some other charity, or to an entirely different charity, the grant is in effect set aside, and a new contract substituted in its place; thus disappointing completely the intentions of the founder, by changing the objects of his bounty. And can it be seriously contended, that a law, which changes so materially the terms of a contract, does not impair it? In short, does not every alteration of a contract, however unimportant, even though it be manifestly for the interest of the party objecting to it, impair its obligation? If the assent of all the parties to be bound by a contract, be of its essence, how *is it possible, that a new contract, substituted [*663 for, or engrafted on another, without such assent, should not violate the old charter?
This course of reasoning, which appears to be perfectly manifest, is not without authority to support it. Mr. Justice Blackstone lays it down (2 Bl. Com. 37), that the same identical franchise, that has been before granted to one, cannot be bestowed on another; and the reason assigned is, that it would prejudice the former grant. In the King v. Pasmore, 3 T.R. 246, Lord KENYON says, that an existing corporation cannot have another charter obtruded upon it by the crown. It may reject it, or accept the whole, or any part of the new charter. The reason is obvious; a charter is a contract, to the validity of which the consent of both parties is essential, and therefore, it cannot be altered or added to without such consent.
But the case of Terrett v. Taylor, 9 Cranch 43, fully supports the distinction above stated, between civil and private corporations, and is entirely in point. It was decided in that case, that a private corporation, created by the legislature, may lose its franchises by misuser, or non-user, and may be resumed by the government, under a judicial judgment of forfeiture. In *316 respect to public corporations, which exist only for public purposes, such as towns, cities, &c., the legislature may, under proper limitations, change, modify, enlarge or restrain them, securing, however, the property for the use of those for whom, and at whose expense, it was purchased. But it is *664] denied, that it has power to repeal *statutes creating private corporations, or confirming to them property already acquired under the faith of previous laws; and that it can, by such repeal, vest the property of such corporations in the state, or dispose of the same to such purposes as it may please, without the consent or default of the corporators. Such a law, it is declared, would be repugnant both to the spirit and the letter of the constitution of the United States.
If these principles, before laid down, be correct, it cannot be denied, that the obligations of the charter to Dartmouth College are impaired by the laws under consideration. The name of the corporation, its constitution and government, and the objects of the founder, and of the grantor of the charter, are totally changed. By the charter, the property of this founder was vested in twelve trustees, and no more, to be disposed of by them, or a majority, for the support of a college, for the education and instruction of the Indians, and also of English youth, and others. Under the late acts, the trustees and visitors are different; and the property and franchises of the college are transferred to different and new uses, not contemplated by the founder. In short, it is most obvious, that the effect of these laws is to abolish the old corporation, and to create a new one in its stead. The laws of Virginia, referred to in the case of Terrett v. Taylor, authorized the overseers of the poor to sell the glebes belonging to the Protestant Episcopal Church, and to appropriate the proceeds to other uses. The laws in question divest the trustees of Dartmouth College of the property vested in them *665] *by the founder, and vest it in other trustees, for the support of a different institution, called Dartmouth University. In what respects do they differ? Would the difference have been greater in principle, if the law had appropriated the funds of the college to the making of turnpike roads, or to any other purpose of a public nature? In all respects, in which the contract has been altered, without the assent of the corporation, its obligations have been impaired; and the degree can make no difference in the construction of the above provision of the constitution.
It has been insisted, in the argument at the bar, that Dartmouth College was a mere civil corporation, created for a public purpose, the public being deeply interested in the education of its youth; and that, consequently, the charter was as much under the control of the government of New Hampshire, as if the corporation had concerned the government of a town or city. But it has been shown, that the authorities are all the other way. There is not a case to be found which contradicts the doctrine laid down in the case of Philips v. Bury, viz., that a college, founded by an individual, or individuals, is a private charity, subject to the government and visitation of the founder, and not to the unlimited control of the government.
It is objected, in this case, that Dr. Wheelock is not the founder of Dartmouth College. Admit, he is not. How would this alter the case? Neither the king, nor the province of New Hampshire was the founder; and if the contributions made by the governor of New Hampshire, by those *666] persons who *granted lands for the college, in order to induce its location *317 in a particular part of the state, by the other liberal contributors in England and America, bestow upon them claims equal with Dr. Wheelock, still it would not alter the nature of the corporation, and convert it into one for public government. It would still be a private eleemosynary corporation, a private charity, endowed by a number of persons, instead of a single individual. But the fact is, that whoever may mediately have contributed to swell the funds of this charity, they were bestowed at the solicitation of Dr. Wheelock, and vested in persons appointed by him, for the use of a charity, of which he was the immediate founder, and is so styled in the charter.
Upon the whole, I am of opinion, that the above acts of New Hampshire, not having received the assent of the corporate body of Dartmouth College, are not binding on them, and, consequently, that the judgment of the state court ought to be reserved.
JOHNSON, Justice, concurred, for the reasons stated by the Chief Justice.
LIVINGSTON, Justice, concurred, for the reasons stated by the Chief Justice, and Justices WASHINGTON and STORY.
STORY, Justice.
This is a cause of great importance, and as the very learned discussions, as well here, as in the state court, show, of no inconsiderable difficulty. There are two questions, to which the appellate jurisdiction of this court properly applies. *1. Whether the original [*667 charter of Dartmouth College is a contract, within the prohibitory clause of the constitution of the United States, which declares, that no state shall pass any "law impairing the obligation of contracts?" 2. If so, whether the legislative acts of New Hampshire of the 27th of June, and of the 18th and 27th of December 1816, or any of them, impair the obligations of that charter?
It will be necessary, however, before we proceed to discuss these questions, to institute an inquiry into the nature, rights and duties of aggregate corporations, at common law; that we may apply the principles, drawn from this source, to the exposition of this charter, which was granted emphatically with reference to that law.
An aggregate corporation, at common law, is a collection of individuals, united into one collective body, under a special name, and possessing certain immunities, privileges and capacities, in its collective character, which do not belong to the natural persons composing it. Among other things, it possesses the capacity of perpetual succession, and of acting by the collected vote or will of its component members, and of suing and being sued in all things touching its corporate rights and duties. It is, in short, an artificial person, existing in contemplation of law, and endowed with certain powers and franchises which, though they must be exercised through the medium of its natural members, are yet considered as subsisting in the corporation itself, as distinctly as if it were a real personage. Hence, such a corporation may sue and be sued by its own members, and *may contract with them in [*668 the same manner, as with any strangers. 1 Bl. Com. 469, 475; 1 Kyd on Corp. 13, 69, 189; 1 Wooddes. 471, &c. A great variety of these corporations exist, in every country governed by the common law; in some *318 of which, the corporate existence is perpetuated by new elections, made from time to time; and in others, by a continual accession of new members, without any corporate act. Some of these corporations are, from the particular purposes to which they are devoted, denominated spiritual, and some lay; and the latter are again divided into civil and eleemosynary corporations. It is unnecessary, in this place, to enter into any examination of civil corporations. Eleemosynary corporations are such as are constituted for the perpetual distribution of the free-alms and bounty of the founder, in such manner as he has directed; and in this class, are ranked hospitals for the relief of poor and impotent persons, and colleges for the promotion of learning and piety, and the support of persons engaged in literary pursuits. 1 Bl. Com. 469, 470, 471, 482. 1 Kyd on Corp. 25; 1 Wooddes. 474; Attorney-General v. Whorwood, 1 Ves. 534; St. John's College v. Todington, 1 W. Bl. 84; s.c. 1 Burr. 200; Philips v. Bury, 1 Ld. Raym. 5; s.c. 2 T.R. 346; Porter's Case, 1 Co. 22 b, 23.
Another division of corporations is into public and private. Public corporations are generally esteemed such as exist for public political purposes only, such as towns, cities, parishes and counties; and in many repects, they are so, although they involve some private interests; but strictly speaking, *669] public corporations *are such only as are founded by the government, for public purposes, where the whole interests belong also to the government. If, therefore, the foundation be private, though under the charter of the government, the corporation is private, however extensive the uses may be to which it is devoted, either by the bounty of the founder, or the nature and objects of the institution. For instance, a bank created by the government for its own uses, whose stock is exclusively owned by the government, is, in the strictest sense, a public corporation. So, an hospital created and endowed by the government for general charity. But a bank, whose stock is owned by private persons, is a private corporation, although it is erected by the government, and its objects and operations partake of a public nature. The same doctrine may be affirmed of insurance, canal, bridge and turnpike companies. In all these cases, the uses may, in a certain sense, be called public, but the corporations are private; as much so, indeed, as if the franchises were vested in a single person.
This reasoning applies in its full force to eleemosynary corporations. An hospital, founded by a private benefactor, is, in point of law, a private corporation, although dedicated by its charter to general charity. So, a college, founded and endowed in the same manner, although, being for the promotion of learning and piety, it may extend its charity to scholars from every class in the community, and thus acquire the character of a public institution. This is the unequivocal doctrine of the authorities; and cannot be *670] *shaken but by undermining the most solid foundations of the common law. Philips v. Bury, 1 Ld. Raym. 5, 9; s.c. 2 T.R. 346.
It was, indeed, supposed at the argument, that if the uses of an eleemosynary corporation be for general charity, this alone would constitute it a public corporation. But the law is certainly not so. To be sure, in a certain sense, every charity, which is extensive in its reach, may be called a public charity, in contradistinction to a charity embracing but a few definite objects. In this sense, the language was unquestionably used by Lord HARDWICKE in the case cited at the argument; Attorney-General v. Pearce, *319 2 Atk. 87; 1 Bac. Abr. tit. Charitable Uses, E, 589; and in this sense, a private corporation may well enough be denominated a public charity. So it would be, if the endowment, instead of being vested in a corporation, were assigned to a private trustee; yet, in such a case, no one would imagine, that the trust ceased to be private, or the funds became public property. That the mere act of incorporation will not change the charity from a private to a public one, is most distinctly asserted in the authorities. Lord HARDWICKE, in the case already alluded to, says, "the charter of the crown cannot make a charity more or less public, but only more permanent than it would otherwise be; but it is the extensiveness which will constitute it a public one. A devise to the poor of the parish is a public charity. Where testators leave it to the discretion of a trustee to choose out the objects, though each particular *object may be said to be private, yet in the extensiveness [*671 of the benefit accruing from them, they may properly be called public charities. A sum to be disposed of by A.B., and his executors, at their discretion, among poor house-keepers, is of this kind." The charity, then, may, in this sense, be public, although it may be administered by private trustees; and for the same reason, it may thus be public, though administered by a private corporation. The fact, then, that the charity is public, affords no proof that the corporation is also public; and consequently, the argument, so far as it is built on this foundation, falls to the ground. If, indeed, the argument were correct, it would follow, that almost every hospital and college would be a public corporation; a doctrine utterly irreconcilable with the whole current of decisions since the time of Lord COKE.[(a)]
When, then, the argument assumes, that because the charity is public, the corporation is public, it manifestly confounds the popular, with the strictly legal, sense of the terms. And if it stopped here, it would not be very material to correct the error. But it is on this foundation, that a superstructure is erected, which is to compel a surrender of the cause. When the corporation is said, at the bar, to be public, it is not merely meant, that the whole community may be the proper objects of the bounty, but that the government have the sole right, as trustees of the public interests, to regulate; control and direct the corporation, and its funds and its franchises, at its own good will and pleasure. Now, such *an authority does not [*672 exist in the government, except where the corporation, is in the strictest sense, public; that is, where its whole interests and franchises are the exclusive property and domain of the government itself. If it had been otherwise, courts of law would have been spared many laborious adjudications in respect to eleemosynary corporations, and the visitatorial powers over them, from the time of Lord HOLT down to the present day. Rex v. Bury, 1 Ld. Raym. 5; S.C. Comb. 265; Holt 715; 1 Show. 360; 4 Mod. 106; Skin. 447, and Ld. HOLT'S opinion from his own MS., in 2 T.R. 346. Nay, more, private trustees for charitable purposes would have been liable to have the property confided to their care taken away from them, without any assent or default on their part, and the administration submitted, not to the control of law and equity, but to the arbitrary discretion of the government. Yet, who ever thought before, that the munificient gifts of private donors for general charity became instantaneously the property of the *320 government; and that the trustees appointed by the donors, whether corporate or unincorporated, might be compelled to yield up their rights to whomsoever, the government might appoint to administer them? If we were to establish such a principle, it would extinguish all future eleemosynary endowments; and we should find as little of public policy, as we now find of law to sustain it.
An eleemosynary corporation, then, upon a private foundation, being a private corporation, it is next to be considered, what is deemed a foundation, *673] *and who is the founder. This cannot be stated with more brevity and exactness, than in the language of the elegant commentator upon the laws of England: "The founder of all corporations (says Sir William Blackstone), in the strictest and original sense, is the king alone, for he only can incorporate a society; and in civil corporations, such as mayor, commonalty, &c., where there are no possessions or endowments given to the body, there is no other founder but the king; but in eleemosynary foundations, such as colleges and hospitals, where there is an endowment of lands, the law distinguishes and makes two species of foundation, the one foundatio incipiens, or the incorporation, in which sense the king is the general founder of all colleges and hospitals; the other fundatio perficiens, or the dotation of it, in which sense, the first gift of the revenues is the foundation, and he who gives them is, in the law, the founder; and it is in this last sense, we generally call a man the founder of a college or hospital." 1 Bl. Com. 480; 10 Co. 33.
To all eleemosynary corporations, a visitatorial power attaches, as a necessary incident; for these corporations being composed of individuals, subject to human infirmities, are liable, as well as private persons, to deviate from the end of their institution. The law, therefore, has provided, that there shall somewhere exist a power to visit, inquire into, and correct all irregularities and abuses in such corporations, and to compel the original purposes of the charity to be faithfully fulfilled. 1 Bl. Com. 480. The nature *674] and extent of this visitatorial power has been expounded *with admirable fulness and accuracy by Lord HOLT in one of his most celebrated judgments. Phillips v. Bury, 1 Ld. Raym. 5; S.C. 2 T.R. 346. And of common right, by the dotation, the founder and his heirs are the legal visitors, unless the founder has appointed and assigned another person to be visitor. For the founder may, if he please, at the time of the endowment, part with his visitatorial power, and the person to whom it is assigned will, in that case, possess it in exclusion of the founder's heirs. 1 Bl. Com. 482. This visitatorial power is, therefore, an hereditament founded in property, and valuable, in intendment of law; and stands upon the maxim, that he who gives his property, has a right to regulate it in future. It includes also the legal right of patronage, for as Lord HOLT justly observes, "patronage and visitation are necessary consequents one upon another." No technical terms are necessary to assign or vest the visitatorial power; it is sufficient if, from the nature of the duties to be performed by particular persons, under the charter, it can be inferred, that the founder meant to part with it in their favor; and he may divide it among various persons, or subject it to any modifications or control, by the fundamental statutes of the corporation. But where the appointment is given in general terms, the whole power vests in the appointee. Eden v. Foster, 2 P. Wms. 325; Attorney-General v. *321 Middleton, 2 Ves. 327; St. Johns College v. Todington, 1 W. Bl. 84.; S.C. 2 Burr. 200; Attorney-General v. Clare College, 3 Atk. 662; S.C. 1 Ves. 78. In the construction *of charters, too, it is a general rule, that if [*675 the objects of the charity are incorporated, as for instance, the master and fellows of a college, or the master and poor of a hospital, the visitatorial power, in the absence of any special appointment, silently vests in the founder and his heirs. But where trustees or governors are incorporated to manage the charity, the visitatorial power is deemed to belong to them in their corporate character. Philips v. Bury, 1 Ld. Raym. 5; S.C. 2 T.R. 346; Green v. Rutherforth, 1 Ves. 472; Attorney-General v. Middleton, 2 Ibid. 327; Case of Sutton Hospital, 10 Co. 23, 31.
When a private eleemosynary corporation is thus created, by the charter of the crown, it is subject to no other control on the part of the crown, than what is expressly or implicitly reserved by the charter itself. Unless a power be reserved for this purpose, the crown cannot, in virtue of its prerogative, without the consent of the corporation, alter or amend the charter, or divest the corporation of any of its franchises, or add to them, or add to, or diminish, the number of the trustees, or remove any of the members, or change or control the administration of the charity, or compel the corporation to receive a new charter. This is the uniform language of the authorities, and forms one of the most stubborn, and well settled doctrines of the common law.[(a)]
But an eleemosynary, like every other corporation, is subject to the general law of the land. It may forfeit its corporate franchises, by misuser or non-user *of them. It is subject to the controling authority of its [*676 legal visitor, who, unless restrained by the terms of the charter, may amend and repeal its statutes, remove its officers, correct abuses, and generally superintend the management of the trusts. Where, indeed, the visitatorial power is vested in the trustees of the charity, in virtue of their incorporation, there can be no amotion of them from their corporate capacity. But they are not, therefore, placed beyond the reach of the law. As managers of the revenues of the corporation, they are subject to the general superintending power of the court of chancery, not as itself possessing a visitatorial power, or a right to control the charity, but as possessing a general jurisdiction, in all cases of an abuse of trust, to redress grievances and suppress frauds.[1] And where a corporation is a mere trustee of a charity, a court of equity will go yet further; and though it cannot appoint or remove a corporator, it will, yet, in a case of *322 *677] *gross fraud, or abuse of trust, take away the trust from the corporation, and vest it in other hands. Mayor, &c., of Coventry v. Attorney-General, 7 Bro. P.C. 235; Attorney-General v. Earl of Clarendon, 17 Ves. 491, 499.
Thus much it has been though proper to premise respecting the nature, rights, and duties of eleemosynary corporations, growing out of the common law. We may now proceed to an examination of the original charter of Dartmouth College.
It begins, by a recital, among other things, that the Rev. Eleazer Wheelock, of Lebanon, in Connecticut, about the year 1754, at his own expense, on his own estate, set on foot an Indian charity-school; and by the assistance of other persons, educated a number of the children of the Indians, and employed them as missionaries and school-masters among the savage tribes; that the design became reputable among the Indians, so that more desired the education of their children at the school, than the contributions in the American colonies would support; that the said Wheelock thought it expedient to endeavor to procure contributions in England, and requested the Rev. Nathaniel Whitaker to go to England, as his attorney, to solicit contribution, and also solicited the Earl of Dartmouth and others, to receive the contributions and become trustees thereof, which they cheerfully agreed to, and he constituted them trustees accordingly, by a power of attorney, and they testified their acceptance by a sealed instrument; that the said *678] Wheelock also authorized the trustees to fix and determine *upon the place for the said school; and to enable them understandingly to give the preference, laid before them, the several offers of the governments in America, inviting the settlement of the school among them; that a large number of the proprietors of lands, in the western parts of New Hampshire, to aid the design, and considering that the same school might be enlarged and improved to promote learning among the English, and to supply the churches there with an orthodox ministry, promised large tracts of land for the uses aforesaid, provided the school should be settled in the western part of said province; that the trustees, thereupon, gave a preference to the western part of said province, lying on Connecticut river, as a situation most convenient for said school: That the said Wheelock further represented the necessity for a legal incorporation, in order to the safety and well-being of said seminary, and its being capable of the tenure and disposal of lands and bequests for the use of the same; that in the infancy of said institution, certain gentlemen whom he had already nominated in his last will (which he had transmitted to the trustees in England), to be trustees in America, should be the corporation now proposed; and lastly, that there were already large contributions for said school in the hands of the trustees in England, and further success might be expected; for which reason, the said Wheelock desired they might be invested with all that power therein, which could consist with their distance from the same. The charter, after these recitals, declares, that the king, considering the premises, and being willing to *679] *encourage the charitable design, and that the best means of education might be established in New Hampshire for the benefit thereof, does, of his special grace, certain knowledge and mere motion, ordain and grant, that there be a college erected in New Hampshire, by the name of Dartmouth College, for the education and instruction of youth of the Indian tribes, and also of English youth and others; that the trustees of said college *323 shall be a corporation for ever, by the name of the Trustees of Dartmouth College: that the then governor of New Hampshire, the said Wheelock, and ten other persons, specially named in the charter, shall be trustees of the said college, and that the whole number of trustees shall for ever thereafter consist of twelve, and no more; that the said corporation shall have power to sue and to be sued by their corporate name, and to acquire and hold for the use of the said Dartmouth College, lands, tenements, hereditaments and franchises; to receive, purchase and build any houses for the use of said college, in such town in the western part of New Hampshire, as the trustees, or a major part of them, shall, by a written instrument, agree on; and to receive, accept and dispose of any lands, goods, chattels, rents, gifts, legacies, &c., not exceeding the yearly value of 6000l. It further declares, that the trustees, or a major part of them, regularly convened (for which purpose seven shall form a quorum), shall have authority to appoint and remove the professors, tutors and other officers of the college, and to pay them, and also such missionaries and school-masters as shall be employed by the trustees for instructing the Indians, salaries and *allowances, as [*680 well as other corporate expenses, out of the corporate funds. It further declares, that, the said trustees, as often as one or more of the trustees shall die, or, by removal or otherwise, shall, according to their judgment, become unfit or incapable to serve the interests of the college, shall have power to elect and appoint other trustees in their stead, so that when the whole number shall be complete of twelve trustees, eight shall be resident freeholders of New Hampshire, and seven of the whole number, laymen. It further declares, that the trustees shall have power, from time to time, to make and establish rules, ordinances and laws, for the government of the college, not repugnant to the laws of the land, and to confer collegiate degrees. It further appoints the said Wheelock, whom it denominates "the founder of the college," to be president of the college, with authority to appoint his successor, who shall be president, until disapproved of by the trustees. It then concludes with a direction, that it shall be the duty of the president to transmit to the trustees in England, so long as they should perpetuate their board, and as there should be Indian natives remaining to be proper objects of the bounty, an annual account of all the disbursements from the donations in England, and of the general plans and prosperity of the institution.
Such are the most material clauses of the charter. It is observable, in the first place, that no endowment whatever is given by the crown; and no power is reserved to the crown or government in any manner to alter, amend or control the charter. It is also apparent, *from the very [*681 terms of the charter, that Dr. Wheelock is recognised as the founder of the college, and that the charter is granted upon his application, and that the trustees were in fact nominated by him. In the next place, it is apparent, that the objects of the institution are purely charitable, for the distribution of the private contributions of private benefactors. The charity was, in the sense already explained, a public charity, that is, for the general promotion of learning and piety; but in this respect, it was just as much public before, as after the incorporation. The only effect of the charter was to give permanency to the design, by enlarging the sphere of its action, and granting a perpetuity of corporate powers and franchises, the better to *324 secure the administration of the benevolent donations. As founder, too, Dr. Wheelock and his heirs would have been completely clothed with the visitatorial power: but the whole government and control, as well of the officers as of the revenues of the college, being with his consent assigned to the trustees in their corporate character, the visitatorial power, which is included in this authority, rightfully devolved on the trustees. As managers of the property and revenues of the corporation, they were amenable to the jurisdiction of the judicial tribunals of the state; but as visitors, their discretion was limited only by the charter, and liable to no supervision or control, at least, unless it was fraudulently misapplied.
From this summary examination it follows, that Dartmouth College was, under its original charter, a private eleemosynary corporation, endowed with *682] *the usual privileges and franchises of such corporations, and among others, with a legal perpetuity, and was exclusively under the government and control of twelve trustees, who were to be elected and appointed, from time to time, by the existing board, as vacancies or removals should occur.
We are now led to the consideration of the first question in the cause, whether this charter is a contract, within the clause of the constitution prohibiting the states from passing any law impairing the obligation of contracts. In the case of Fletcher v. Peck, 6 Cranch 87, 136, this court laid down its exposition of the word "contract" in this clause, in the following manner: "A contract is a compact between two or more persons, and is either executory or executed. An executory contract is one, in which a party binds himself to do, or not to do, a particular thing. A contract executed is one in which the object of the contract is performed; and this, says Blackstone, differs in nothing from a grant. A contract executed, as well as one that is executory, contains obligations binding on the parties. A grant, in its own nature, amounts to an extinguishment of the right of the grantor, and implies a contract not to re-assert that right. A party is always estopped by his own grant." This language is perfectly unambiguous, and was used in reference to a grant of land by the governor of a state, under a legislative act. It determines, in the most unequivocal manner, that the grant *683] *of a state is a contract, within the clause of *the constitution now in question, and that it implies a contract not to re-assume the rights granted; à fortiori, the doctrine applies to a charter or grant from the king.
But it is objected, that the charter of Dartmouth College is not a contract contemplated by the constitution, because no valuable consideration passed to the king, as an equivalent for the grant, it purporting to be granted ex mcro motá, and further, that no contracts, merely voluntary, are within the prohibitory clause. It must be admitted, that mere executory contracts cannot be enforced at law, unless there be a valuable consideration to sustain them; and the constitution certainly did not mean to create any new obligations, or give any new efficacy to nude parts. But it must, on the other hand, be also admitted, that the constitution did intend to preserve all the obligatory force of contracts, which they have by the general principles of law. Now, when a contract has once passed, bonâ fide, into grant, neither the king, nor any private person, who may be the grantor, can recall the grant of the property, although the conveyance may have been purely voluntary. A gift, completely executed, is irrevocable. The property conveyed by it *325 becomes, as against the donor, the absolute property of the donee; and no subsequent change of intention of the donor can change the rights of the donee. 2 Bl. Com. 441; Jenk. Cent. 104. And a gift by the crown of incorporeal hereditaments, such as corporate franchises, when executed, comes completely *within the principle, and is, in the strictest sense [*684 of the terms, a grant. 2 Bl. Com. 317, 346; Shep. Touch. ch. 12, p. 227. Was it ever imagined, that land, voluntarily granted to any person by a state, was liable to be resumed, at its own good pleasure? Such a pretension would, under any circumstances, be truly alarming; but in a country like ours, where thousands of land-titles had their origin in gratuitous grants of the states, it would go far to shake the foundations of the best settled estates. And a grant of franchises is not, in point of principle, distinguishable from a grant of any other property. If, therefore, this charter were a pure donation, when the grant was complete, and accepted by the grantees, it involved a contract, that the grantees should hold, and the grantor should not re-assume the grant, as much as if it had been founded on the most valuable consideration.
But it is not admitted, that this charter was not granted for what the law deems a valuable consideration. For this purpose, it matters not how trifling the consideration may be; a pepper-corn is as good as a thousand dollars. Nor is it necessary, that the consideration should be a benefit to the grantor. It is sufficient, if it import damage or loss, or forbearance of benefit, or any act done or to be done, on the part of the grantee. It is unnecessary to state cases; they are familiar to the mind of every lawyer. Pillans v. Van Mierop, per Yates, J., 3 Burr. 1663; Forth v. Stanton, 1 Saund. 211, Williams' note 2, and the cases there cited.
With these principles in view, let us now examine *the terms of [*685 this charter. It purports, indeed, on its face, to be granted "of the special grace, certain knowledge and mere motion" of the king; but these words were introduced for a very different purpose from that now contended for. It is a general rule of the common law (the reverse of that applied in ordinary cases), that a grant of the king, at the suit of the grantee, is to be construed most beneficially for the king, and most strictly against the grantee. Wherefore, it is usual to insert in the king's grants, a clause, that they are made, not at the suit of the grantee, but of the special grace, certain knowledge and mere motion of the king; and then they receive a more liberal construction. This is the true object of the clause in question, as we are informed by the most accurate authorities. 2 Bl. Com. 347; Finch's Law 100; 10 Rep. 112; 1 Shep. Abr. 136; Bull. N.P. 136. But the charter also, on its face, purports to be granted, in consideration of the premises in the introductory recitals.
Now, among these recitals, it appears, that Dr. Wheelock had founded a charity-school at his own expense, on his own estate; that divers contributions had been made in the colonies, by others, for its support; that new contributions had been made, and were making, in England, for this purpose, and were in the hands of trustees appointed by Dr. Wheelock to act in his behalf; that Dr. Wheelock had consented to have the school established at such other place as the trustees should select; that offers had been made by several of the governments in America, inviting the* establishment [*686 of the school among them; that offers of land had also been *326 made by divers proprietors of lands in the western parts of New Hampshire, if the school should be established there; that the trustees had finally consented to establish it in New Hampshire; and that Dr. Wheelock represented that, to effectuate the purposes of all parties, an incorporation was necessary. Can it be truly said, that these recitals contain no legal consideration of benefit to the crown, or of forbearance of benefit on the other side? Is there not an implied contract by Dr. Wheelock, if a charter is granted, that the school shall be removed from his estate to New Hampshire? and that he will relinquish all his control over the funds collected, and to be collected, in England, under his auspices, and subject to his authority? that he will yield up the management of his charity-school to the trustees of the college? that he will relinquish all the offers made by other American governments, and devote his patronage to this institution? It will scarcely be denied, that he gave up the right any longer to maintain the charity-school already established on his own estate; and that the funds collected for its use, and subject to his management, were yielded up by him, as an endowment of the college. The very language of the charter supposes him to be the legal owner of the funds of the charity-school, and in virtue of this endowment, declares him the founder of the college. It matters not, whether the funds were great or small; Dr. Wheelock had procured them, by his *687] own influence, and they were under his control, to be applied to the *support of his charity-school; and when he relinquished this control, he relinquished a right founded in property acquired by his labors. Besides, Dr. Wheelock impliedly agreed to devote his future services to the college, when erected, by becoming president thereof, at a period when sacrifices must necessarily be made to accomplish the great design in view. If, indeed, a pepper-corn be, in the eye of the law, of sufficient value to found a contract, as upon a valuable consideration, are these implied agreements, and these relinquishments of right and benefit, to be deemed wholly worthless? It has never been doubted, that an agreement not to exercise a trade in a particular place was a sufficient consideration to sustain a contract for the payment of money; à fortiori, the relinquishment of property which a person holds, or controls the use of, as a trust, is a sufficient consideration; for it is parting with a legal right. Even a right of patronage (jus patronatus) is of great value in intendment of law. Nobody doubts, that an advowson is a valuable hereditament; and yet, in fact, it is but a mere trust, or right of nomination to a benefice, which cannot be legally sold to the intended incumbent. 2 Bl. Com. 22, Christian's note. In respect to Dr. Wheelock, then, if a consideration be necessary to support the charter as a contract, it is to be found in the implied stipulations on his part in the charter itself. He relinquished valuable rights, and undertook a laborious office, in consideration of the grant of the incorporation.
*688] *This is not all. A charter may be granted upon an executory, as well as an executed or present consideration. When it is granted to persons who have not made application for it, until their acceptance thereof, the grant is yet in fieri. Upon the acceptance, there is an implied contract on the part of the grantees, in consideration of the charter, that they will perform the duties, and exercise the authorities conferred by it. This was the doctrine asserted by the late learned Mr. Justice BULLER, in a modern case. Rex v. Pasmore, 3 T.R. 199, 239, 246. He there said, *327 "I do not know how to reason on this point better than in the manner urged by one of the relator's counsel, who considered the grant of incorporation to be a compact between the crown, and a certain number of the subjects, the latter of whom undertake, in consideration of the privileges which are bestowed, to exert themselves for the good government of the place," (i.e., the place incorporated). It will not be pretended, that if a charter be granted for a bank, and the stockholders pay in their own funds, the charter is to be deemed a grant, without consideration, and therefore, revocable at the pleasure of the grantor. Yet, here, the funds are to be managed, and the services performed exclusively for the use and benefit of the stockholders themselves. And where the grantees are mere trustees to perform services, without reward, exclusively for the benefit of others, for public charity, can it be reasonably argued, that these services are less valuable to the government, than if performed for the private emolument of *the trustees [*689 themselves? In respect then to the trustees also, there was a valuable consideration for the charter, the consideration of services agreed to be rendered by them, in execution of a charity, from which they could receive no private remuneration.
There is yet another view of this part of the case, which deserves the most weighty consideration. The corporation was expressly created for the purpose of distributing in perpetuity the charitable donations of private benefactors. By the terms of the charter, the trustees, and their successors, in their corporate capacity, were to receive, hold and exclusively manage all the funds so contributed. The crown, then, upon the face of the charter, pledged its faith that the donations of private benefactors should be perpetually devoted to their original purposes, without any interference on its own part, and should be for ever administered by the trustees of the corporation, unless its corporate franchises should be taken away by due process of law. From the very nature of the case, therefore, there was an implied contract on the part of the crown, with every benefactor, that if he would give his money, it should be deemed a charity protected by the charter, and be administered by the corporation, according to the general law of the land. As, soon, then, as a donation was made to the corporation, there was an implied contract, springing up, and founded on a valuable consideration, that the crown would not revoke or alter the charter, or change its administration, without the consent of the corporation. There was also an implied contract between the corporation itself, and every benefactor, *upon a like consideration, that it would administer his bounty according [*690 to the terms, and for the objects stipulated in the charter.
In every view of the case, if a consideration were necessary (which I utterly deny) to make the charter a valid contract, a valuable consideration did exist, as to the founder, the trustees, and the benefactors. And upon the soundest legal principles, the charter may be properly deemed, according to the various aspects in which it is viewed, as a several contract with each of these parties, in virtue of the foundation, or the endowment of the college, or the acceptance of the charter, or the donations to the charity.
And here we might pause: but there is yet remaining another view of the subject, which cannot consistently be passed over without notice. It seems to be assumed by the argument of the defendant's counsel, that there is no contract whatsoever, in virtue of the charter, between the crown and *328 the corporation itself. But it deserves consideration, whether this assumption can be sustained upon a solid foundation.
If this had been a new charter, granted to an existing corporation, or a grant of lands to an existing corporation, there could not have been a doubt, that the grant would have been an executed contract with the corporation; as much so, as if it had been to any private person. But it is supposed, that as this corporation was not then in existence, but was created and its franchises bestowed, uno flatû, the charter cannot be construed a contract, because there was no person in rerum naturæ, with whom it might be made. *691] Is this, however, a just and legal view of the *subject? If the corporation had no existence, so as to become a contracting party, neither had it, for the purpose of receiving a grant of the franchises. The truth is, that there may be a priority of operation of things in the same grant; and the law distinguishes and gives such priority, wherever it is necessary to effectuate the objects of the grant. Case of Sutton Hospital, 10 Co. 23; Buckland v. Fowcher, cited, Ibid. 27-8, and recognised in Attorney-General v. Bowyer, 3 Ves. jr. 714, 726-7; S.P. Highmore on Mort. 200, &c. From the nature of things, the artificial person called a corporation, must be created, before it can be capable of taking anything. When, therefore, a charter is granted, and it brings the corporation into existence, without any act of the natural persons who compose it, and gives such corporation any privileges, franchises or property, the law deems the corporation to be first brought into existence, and then clothes it with the granted liberties and property. When, on the other hand, the corporation is to be brought into existence, by some future acts of the corporatiors, the franchises remain in abeyance, until such acts are done, and when the corporation is brought into life, the franchises instantaneously attach to it. There may be, in intendment of law, a priority of time, even in an instant, for this purpose. Ibid. And if the corporation have an existence, before the grant of its other franchises attaches, what more difficulty is there in deeming the grant of these franchises a contract with it, than if granted by another instrument, at a subsequent period?
It behooves those also, who hold, that a grant to a corporation, not then *692] in existence, is incapable *of being deemed a contract, on that account, to consider, whether they do not, at the same time, establish, that the grant itself is a nullity, for precisely the same reason. Yet such a doctrine would strike us all, as pregnant with absurdity, since it would prove that an act of incorporation could never confer any authorities, or rights or property on the corporation it created. It may be admitted, that two parties are necessary to form a perfect contract; but it is denied, that it is necessary, that the assent of both parties must be at the same time. If the legislature were voluntarily to grant land in fee, to the first child of A., to be hereafter born; as soon as such child should be born, the estate would vest in it. Would it be contended, that such grant, when it took effect, was revocable, and not an executed contract, upon the acceptance of the estate? The same question might be asked, in a case of a gratuitous grant by the king, or the legislature, to A. for life, and afterwards, to the heirs of B., who is then living. Take the case of a bank, incorporated for a limited period, upon the express condition that it shall pay out of its corporate funds, a certain sum, as the consideration for the charter, and after the corporation is organized, *329 a payment duly made of the sum, out of the corporate funds; will it be contended, that there is not a subsisting contract between the government and the corporation, by the matters thus arising ex post facto, that the charter shall not be revoked, during the stipulated period? Suppose, an act declaring that all persons, who should thereafter pay into the public treasury a stipulated sum, should be tenants in common of certain *lands belonging [*693 to the state, in certain proportions; if a person, afterwards born, pays the stipulated sum into the treasury, is it less a contract with him, than it would be with a person in esse at the time the act passed? We must admit, that there may be future springing contracts, in respect to persons not now in esse, or we shall involve ourselves in inextricable difficulties. And if there may be, in respect to natural persons, why not also in respect to artificial persons, created by the law, for the very purpose of being clothed with corporate powers? I am unable to distinguish between the case of a grant of land or of franchises to an existing corporation, and a like grant to a corporation brought into life for the very purpose of receiving the grant. As soon as it is in esse, and the franchises and property become vested and executed in it, the grant is just as much an executed contract, as if its prior existence had been established for a century.
Supposing, however, that in either of the views which have been suggested, the charter of Dartmouth College is to be deemed a contract, we are yet met with several objections of another nature. It is, in the first place, contended, that it is not a contract, within the prohibitory clause of the constitution, because that clause was never intended to apply to mere contracts of civil institution, such as the contract of marriage, or to grants of power to state officers, or to contracts relative to their offices, or to grants of trust to be exercised for purposes merely public, where the grantees take no beneficial interest.
It is admitted, that the state legislatures have *power to enlarge, [*694 repeal and limit the authorities of public officers, in their official capacities, in all cases, where the constitutions of the states respectively do not prohibit them; and this, among others, for the very reason, that there is no express or implied contract, that they shall always, during their continuance in office, exercise such authorities; they are to exercise them only during the good pleasure of the legislature. But when the legislature makes a contract with a public officer, as in the case of a stipulated salary for his services, during a limited period, this, during the limited period, is just as much a contract, within the purview of the constitutional prohibition, as a like contract would be between two private citizens. Will it be contended, that the legislature of a state can diminish the salary of a judge, holding his office during good behavior? Such an authority has never yet been asserted, to our knowledge. It may also be admitted, that corporations for mere public government, such as towns, cities and counties, may in many respects be subject to legislative control. But it will hardly be contended, that even in respect to such corporations, the legislative power is so transcendent, that it may at its will take away the private property of the corporation, or change the uses of its private funds, acquired under the public faith. Can the legislature confiscate to its own use the private funds which a municipal corporation holds under its charter, without any default or consent of the corporators? If a municipal corporation be capable of holding *330 devises and legacies to charitable uses (as many municipal corporations *695] *are), does the legislature, under our forms of limited government, possess the authority to seize upon those funds, and appropriate them to other uses, at its own arbitrary pleasure, against the will of the donors and donees? From the very nature of our governments, the public faith is pledged the other way; and that pledge constitutes a valid compact; and that compact is subject only to judicial inquiry, construction and abrogation. This court have already had occasion, in other causes, to express their opinion on this subject; and there is not the slightest inclination to retract it. Terrett v. Taylor, 9 Cranch 43; Town of Pawlet v. Clark, Ibid. 292.
As to the case of the contract of marriage, which the argument supposes not to be within the reach of the prohibitory clause, because it is matter of civil institution, I profess not to feel the weight of the reason assigned for the exception. In a legal sense, all contracts, recognised as valid in any country, may be properly said to be matters of civil institution, since they obtain their obligation and construction jure loci contractûs. Titles to land, constituting part of the public domain, acquired by grants under the provisions of existing laws by private persons, are certainly contracts of civil institution. Yet no one ever supposed, that when acquired bonû fide, they were not beyond the reach of legislative revocation. And so, certainly, is the established doctrine of this court. Ibid. A general law, regulating *696] divorces from the contract of marriage, like a law regulating *remedies in other cases of breaches of contracts, is not necessarily a law impairing the obligation of such a contract.[(a)] It may be the only effectual mode of enforcing the obligations of the contract on both sides. A law punishing a breach of a contract, by imposing a forfeiture of the rights acquired under it, or dissolving it, because the mutual obligations were no longer observed, is, in no correct sense, a law impairing the obligations of the contract. Could a law, compelling a specific performance, by giving a new remedy, be justly deemed an excess of legislative power? Thus far the contract of marriage has been considered with reference to general laws regulating divorces upon breaches of that contract. But if the argument means to assert, that the legislative power to dissolve such a contract, without such a breach on either side, against the wishes of the parties, and without any judicial inquiry to ascertain a breach, I certainly am not prepared to admit such a power, or that its exercise would not entrench upon the prohibition of the constitution. If, under the faith of existing laws, a contract of marriage he duly solemnized, or a marriage settlement be made (and marriage is always in law a valuable consideration for a contract), it is not easy to perceive, why a dissolution of its obligations, without any default or assent of the parties, may not as well fall within the prohibition, as any other contract for a valuable consideration. A man has just as good a right *697] to his wife, as to the property acquired under a marriage *contract. He has a legal right to her society and her fortune; and to divest such right, without his default, and against his will, would be as flagrant a violation of the principles of justice, as the confiscation of his own estate. I leave this case, however, to be settled, when it shall arise. I have gone *331 into it, because it was urged with great earnestness upon us, and required a reply. It is sufficient now to say, that as at present advised, the argument derived from this source, does not press my mind with any new and insurmountable difficulty.
In respect also to grants and contracts, it would be far too narrow a construction of the constitution, to limit the prohibitory clause to such only where the parties take for their own private benefit. A grant to a private trustee, for the benefit of a particular cestui que trust, or for any special, private or public charity, cannot be the less a contract, because the trustee takes nothing for his own benefit. A grant of the next presentation to a church is still a contract, although it limit the grantee to a mere right of nomination or patronage. 2 Bl. Com. 21. The fallacy of the argument consists, in assuming the very ground in controversy. It is not admitted, that a contract with a trustee is, in its own nature, revocable, whether it be for special or general purposes, for public charity or particular beneficence. A private donation, vested in a trustee, for objects of a general nature, does not thereby become a public trust, which the government may, at its pleasure, take from the trustee, and administer *in its own way. The truth [*698 is, that the government has no power to revoke a grant, even of its own funds, when given to a private person, or a corporation, for special uses It cannot recall its own endowments, granted to any hospital or college, or city or town, for the use of such corporations. The only authority remaining to the government is judicial, to ascertain the validity of the grant, to enforce its proper uses, to suppress frauds, and, if the uses are charitable, to secure their regular administration, through the means of equitable tribunals, in cases where there would otherwise be a failure of justice.
Another objection growing out of, and connected with that which we have been considering, is, that no grants are within the constitutional prohibition, except such as respect property in the strict sense of the term; that is to say, beneficial interests in lands, tenements and hereditaments, &c., which may be sold by the grantees, for their own benefit: and that grants of franchises, immunities and authorities not valuable to the parties, as property, are excluded from its purview. No authority has been cited to sustain this distinction, and no reason is perceived to justify its adoption. There are many rights, franchises and authorities, which are valuable in contemplation of law, where no beneficial interest can accrue to the possessor. A grant of the next presentation to a church, limited to the grantee alone, has been already mentioned. A power of appointment, reserved in a marriage settlement, either to a party or a stranger, to appoint uses in favor of third persons, without compensation, is another instance. *A grant of lands [*699 to a trustee, to raise portions or pay debts, is, in law, a valuable grant, and conveys a legal estate. Even a power, given by will, to executors, to sell an estate for payment of debts is, by the better opinions and authority, coupled with a trust, and capable of survivorship.[2] Many dignities and offices, existing at common law, are merely honorary, and without profit, and sometimes are onerous. Yet a grant of them has never been supposed the *332 less a contract on that account. In respect to franchises, whether corporate or not, which include a pregnancy of profits, such as a right of fishery, or to hold a ferry, a market or a fair, or to erect a turnpike, bank or bridge, there is no pretence to say, that grants of them are not within the constitution. Yet they may, in point of fact, be of no exchangeable value to the owners. They may be worthless in the market. The truth, however, is, that all incorporeal hereditaments, whether they be immunities, dignities, offices or franchises, or other rights, are deemed valuable in law. The owners have a legal estate and property in them, and legal remedies to support and recover them, in case of any injury, obstruction or disseisin of them. Whenever they are the subjects of a contract or grant, they are just as much within the *700] reach of the constitution as any other grant. *Nor is there any solid reason why a contract for the exercise of a mere authority should not be just as much guarded, as a contract for the use and dominion of property. Mere naked powers, which are to be exercised for the exclusive benefit of the grantor, are revocable by him, for that very reason. But it is otherwise, where a power is to be exercised in aid of a right vested in the grantee. We all know, that a power of attorney, forming a part of a security upon the assignment of a chose in action, is not revocable by the grantor. For it then sounds in contract, and is coupled with an interest. Walsh v. Whitcomb, 2 Esp. 565; Bergen v. Bennett, 1 Caines' Cas. 1, 15; Raymond v. Squire; 11 Johns. 47. So, if an estate be conveyed in trust for the grantor, the estate is irrevocable in the grantee, although he can take no beneficial interest for himself. Many of the best settled estates stand upon conveyances of this nature; and there can be no doubt, that such grants are contracts within the prohibition in question.
In respect to corporate franchises, they are, properly speaking, legal estates, vested in the corporation itself, as soon as it is in esse. They are not mere naked powers, granted to the corporation; but powers coupled with an interest. The property of the corporation rests upon the possession of its franchises; and whatever may be thought, as to the corporators, it cannot be denied, that the corporation itself has a legal interest in them. It may sue and be sued for them. Nay, more, this very right is one of its *701] ordinary *franchises. "It is likewise a franchise," says Mr. Justice Blackstone, "for a number of persons to be incorporated and subsist as a body politic, with power to maintain perpetual succession, and do other corporate acts; and each individual member of such corporation is also said to have a franchise or freedom." 2 Bl. Com. 37;] Kyd on Corp. 14, 16. In order to get rid of the legal difficulty of these franchises being considered as valuable hereditaments or property, the counsel for the defendant are driven to contend, that the corporators or trustees are mere agents of the corporation, in whom no beneficial interest subsists; and so nothing but a naked power is touched, by removing them from the trust; and then to hold the corporation itself a mere ideal being, capable indeed of holding property or franchises, but having no interest in them which can be the subject of contract. Neither of these positions is admissible. The former has been already sufficiently considered, and the latter may be disposed of in a few words. The corporators are not mere agents, but have vested rights, in their character, as corporators. The right to be a freeman of a corporation, is a valuable temporal right. It is a right of voting and acting in the corporate *333 concerns, which the law recognises and enforces, and for a violation of which it provides a remedy. It is founded on the same basis as the right of voting in public elections; it is as sacred a right; and whatever might have been the prevalence of former doubts, since the time of Lord HOLT, such a right has always been deemed a valuable franchise or privilege. Ashby v. White, 2 Ld. Raym. 938; 1 Kyd on Corp. 16.
*This reasoning, which has been thus far urged, applies with full [*702 force to the case of Dartmouth College. The franchises granted by the charter were vested in the trustees, in their corporate character. The lands and other property, subsequently acquired, were held by them in the same manner. They were the private demesnes of the corporation, held by it, not, as the argument supposes, for the use and benefit of the people of New Hampshire, but, as the charter itself declares, "for the use of Dartmouth College." There were not, and in the nature of things, could not be, any other cestui que use, entitled to claim those funds. They were, indeed, to be devoted to the promotion of piety and learning, not at large, but in that college and the establishments connected with it: and the mode in which the charity was to be applied, and the objects of it, were left solely to the trustees, who were the legal governors and administrators of it. No particular person in New Hampshire possessed a vested right in the bounty; nor could he force himself upon the trustees as a proper object. The legislature itself could not deprive the trustees of the corporate funds, nor annul their discretion in the application of them, nor distribute them among its its own favorites. Could the legislature of New Hampshire have seized the land given by the state of Vermont to the corporation, and appropriated it to uses distinct from those intended by the charity, against the will of the trustees? This question cannot be answered in the affirmative, until it is established that the legislature may lawfully take the property of A. and give it to B.; and if it *could not take away or restrain the corporate [*703 funds, upon what pretence can it take away or restrain the corporate franchises? Without the franchises, the funds could not be used for corporate purposes; but without the funds, the possession of the franchises might still be of inestimable value to the college, and to the cause of religion and learning.
Thus far, the rights of the corporation itself, in respect to its property and franchises, have been more immediately considered. But there are other rights and privileges, belonging to the trustees, collectively and severally, which are deserving of notice. They are intrusted with the exclusive power to manage the funds, to choose the officers, and to regulate the corporate concerns, according to their own discretion. The jus patronatús is vested in them. The visitatorial power, in its most enlarged extent, also belongs to them. When this power devolves upon the founder of a charity, it is an hereditament, descendible in perpetuity to his heirs, and in default of heirs, it escheats to the government. Rex v. St. Catherine's Hall, 4 T.R. 233. It is a valuable right, founded in property, as much so as the right of patronage in any other case. It is a right which partakes of a judicial nature. May not the founder as justly contract for the possession of this right, in return for his endowment, as for any other equivalent? and if, instead of holding it as an hereditament, he assigns it in perpetuity to the trustees of the corporation, is it less a valuable hereditament in their hands? The right is not merely a *334 *704] collective right in all the trustees; *each of them also has a franchise in it. Lord HOLT says, "it is agreeable to reason, and the rules of law, that a franchise should be vested in the corporation aggregate, and yet the benefit redound to the particular members, and be enjoyed by them in their private capacities. Where the privilege of election is used by particular persons, it is a particular right vested in each particular man." Ashby v. White, 2 Ld. Raym. 938, 952; Attorney-General v. Dixie, 13 Ves. 519. Each of the trustees had a right to vote in all elections. If obstructed in the exercise of it, the law furnished him with an adequate recompense in damages. If ousted unlawfully from his office, the law would, by a mandamus, compel a restoration.
It is attempted, however, to establish that the trustees have no interest in the corporate franchises, because it is said, that they may be witnesses, in a suit brought against the corporation. The case cited at the bar certainly goes the length of asserting, that in a suit brought against a charitable corporation, for a recompence for services performed for the corporation, the governors, constituting the corporation (but whether intrusted with its funds or not by the act of incorporation does not appear), are competent witnesses against the plaintiff. Weller v. Governor of the Foundling Hospital, 1 Peake's Cas. 153. But assuming this case to have been rightly decided (as to which, upon the authorities, there may be room to doubt), the *705] corporators *being technically parties to the record (Attorney-General v. City of London, 3 Bro. C.C. 171; S.C. 1 Ves. jr. 243; Burton v. Hinde, 5 T.R. 174; Nason v. Thatcher, 7 Mass. 398; Phillips on Evid. 42, 52, 57 and notes; 1 Kyd on Corp. 304, &c.; Highmore on Mortm. 514), it does not establish, that in a suit for the corporate property vested in the trustees in their corporate capacity, the trustees are competent witnesses. At all events, it does not establish, that in a suit for the corporate franchises to be exercised by the trustees, or to enforce their visitatorial power, the trustees would be competent witnesses. On a mandamus to restore a trustee to his corporate or visitatorial power, it will not be contended, that the trustee is himself a competent witness, to establish his own rights, or the corporate rights. Yet, why not, if the law deems that a trustee has no interest in the franchise? The test of interest assumed in the argument proves nothing in this case. It is not enough, to establish, that the trustees are sometimes competent witnesses; it is necessary to show, that they are always so, in respect to the corporate franchises, and their own. It will not be pretended, that in a suit for damages for obstruction in the exercise of his official powers, a trustee is a disinterested witness. Such an obstruction is not a damnum absque injuriâ. Each trustee has a vested right, and legal interest, in his office, and it cannot be divested but by due course of law. The illustration, therefore, lends no new force to the argument, for it *706] does not establish, that when their own rights *are in controversy, the trustees have no legal interest in their offices.
The principal objections having been thus answered, satisfactorily, at least, to my own mind, it remains only to declare, that my opinion, after the most mature deliberation is, that the charter of Dartmouth College, granted in 1769, is a contract within the purview of the constitutional prohibition.
I might now proceed to the discussion of the second question; but it is necessary previously to dispose of a doctrine which has been very seriously *335 urged at the bar, viz., that the charter of Dartmouth College was dissolved at the revolution, and is, therefore, a mere nullity. A case before Lord THURLOW has been cited in support of this doctrine. Attorney-General v. City of London, 3 Bro. C.C. 171; S.C. 1 Ves. jr. 243. The principal question in that case was, whether the corporation of William & Mary College, in Virginia (which had received its charter from King William and Queen Mary), should still be permitted to administer the charity, under Mr. Boyle's will, no interest having passed to the college, under the will, but it acting as an agent or trustee, under a decree in chancery, or whether a new scheme for the administration of the charity should be laid before the court. Lord THURLOW directed a new scheme, because the college, belonging to an independent government, was no longer within the reach of the court. And he very unnecessarily added, that he could not now consider the college as a corporation, or as another report (1 Ves. jr. 243) states, *that he [*707 could not take notice of it, as a corporation, it not having proved its existence, as a corporation, at all. If, by this, Lord THURLOW meant to declare, that all charters acquired in America from the crown, were destroyed by the revolution, his doctrine is not law; and if it had been true, it would equally apply to all other grants from the crown, which would be monstrous. It is a principle of the common law, which has been recognised as well in this, as in other courts, that the division of an empire works no forfeiture of previously-vested rights of property. And this maxim is equally consonant with the common sense of mankind, and the maxims of eternal justice. Terrett v. Taylor, 9 Cranch 43, 50; Kelly v. Harrison, 2 Johns. Cas. 29; Jackson v. Lunn, 3 Ibid. 109; Calvin's Case, 7 Co. 27. This objection, therefore, may be safely dismissed without further comment.
The remaining inquiry is, whether the acts of the legislature of New Hampshire, now in question, or any of them, impair the obligations of the charter of Dartmouth College. The attempt certainly is to force upon the corporation a new charter, against the will of the corporators. Nothing seems better settled, at the common law, than the doctrine, that the crown cannot force upon a private corporation a new charter; or compel the old members to give up their own franchises, or to admit new members into the corporation. Rex v. Vice-Chancellor of Cambridge, 3 Burr. 1656; Rex v. Pasmore, 3 T.R. 240; 1 Kyd on Corp. 65; Rex v. Larwood, Comb. 316. Neither can the crown compel a man *to become a member of such [*708 corporation, against his will. Rex v. Dr. Askew, 4 Burr. 2200. As little has it been supposed, that under our limited governments, the legislature possessed such transcendent authority. On one occasion, a very able court held, that the state legislature had no authority to compel a person to become a member of a mere private corporation, created for the promotion of a private enterprise, because every man had a right to refuse a grant. Ellis v. Marshall, 2 Mass. 269. On another occasion, the same learned court declared, that they were all satisfied, that the rights legally vested in a corporation cannot be controlled or destroyed by any subsequent statute, unless a power for that purpose be reserved to the legislature in the act of incorporation. Wales v. Stetson, 2 Mass. 143, 146. These principles are so consonant with justice, sound policy and legal reasoning, that it is difficult to resist the impression of their perfect correctness. The application of *336 them, however, does not, from our limited authority, properly belong to the appellate jurisdiction of this court in this case.
A very summary examination of the acts of New Hampshire will abundantly show, that in many material respects they change the charter of Dartmouth College. The act of the 27th of June 1816, declares that the corporation known by the name of the Trustees of Dartmouth College shall be called the Trustees of Dartmouth University. That the whole number of *709] trustees shall be twenty-one, a majority *of whom shall form a quorum; that they and their successors shall hold, use, and enjoy for ever, all the powers, authorities, rights, property, liberties, privileges and immunities, heretofore held, &c., by the trustees of Dartmouth College, except where the act otherwise provides; that they shall also have power to determine the times and places of their meetings, and manner of notifying the same; to organize colleges in the university; to establish an institute, and elect fellows and members thereof; to appoint and displace officers, and determine their duties and compensation; to delegate the power of supplying vacancies in any of the offices of the university for a limited term; to pass ordinances for the government of the students; to prescribe the course of education; and to arrange, invest and employ the funds of the university. The act then provides for the appointment of a board of twenty-five overseers, fifteen of whom shall form a quorum, of whom five are to be such ex officio, and the residue of the overseers, as well as the new trustees, are to be appointed by the governor and council. The board of overseers are, among other things, to have power, "to inspect and confirm, or disapprove and negative, such votes and proceedings of the board of trustees as shall relate to the appointment and removal of president, professors, and other permanent officers of the university, and determine their salaries; to the establishment of colleges and professorships, and the erection of new college buildings." The act then provides, that the president and professors shall *710] be nominated by the trustees, and appointed by the overseers, *and shall be liable to be suspended and removed in the same manner; and that each of the two boards of trustees and overseers shall have power to suspend and remove any member of their respective boards. The supplementary act of the 18th of December 1816, declares, that nine trustees shall form a quorum, and that six votes at least shall be necessary for the passage of any act or resolution. The act of the 26th of December 1816, contains other provisions, not very material to the question before us.
From this short analysis, it is apparent, that, in substance, a new corporation is created, including the old corporators, with new powers, and subject to a new control; or that the old corporation is newly organized and enlarged, and placed under an authority hitherto unknown to it. The board of trustees are increased from twelve to twenty-one. The college becomes a university. The property vested in the old trustees is transferred to the new board of trustees, in their corporate capacities. The quorum is no longer seven, but nine. The old trustees have no longer the sole right to perpetuate their succession, by electing other trustees, but the nine new trustees are, in the first instance, to be appointed by the governor and council, and the new board are then to elect other trustees, from time to time, as vacancies occur. The new board, too, have the power to suspend or remove any member, so that a minority of the old board, co-operating with the new *337 trustees, possess the unlimited power to remove the majority of the old board. The powers, too, of the corporation are varied. It has authority to organize new colleges in *"the university, and to establish an institute, [*711 and elect fellows and members thereof." A board of overseers is created (a board utterly unknown to the old charter), and is invested with a general supervision and negative upon all the most important acts and proceedings of the trustees. And to give complete effect to this new authority, instead of the right to appoint, the trustees are in future only to nominate, and the overseers are to approve, the president and professors of the university.
If these are not essential changes, impairing the rights and authorities of the trustees, and vitally affecting the interests and organization of Dartmouth College, under its old charter, it is difficult to conceive what acts, short of an unconditional repeal of the charter, could have that effect. If a grant of land or franchises be made to A., in trust for special purposes, can the grant be revoked, and a new grant thereof be made to A., B. and C., in trust for the same purposes, without violating the obligation of the first grant? If property be vested by grant in A. and B., for the use of a college, or an hospital, of private foundation, is not the obligation of that grant impaired, when the estate is taken from their exclusive management, and vested in them in common with ten other persons? If a power of appointment be given to A. and B., is it no violation of their right, to annul the appointment, unless it be assented to by five other persons, and then confirmed by a distinct body? If a bank or insurance company, by the terms of its charter, be under the management of directors, elected by the stockholders, would not the *rights acquired by the charter be impaired, [*712 if the legislature should take the right of election from the stockholders, and appoint directors unconnected with the corporation? These questions carry their own answers along with them. The common sense of mankind will teach us, that all these cases would be direct infringements of the legal obligations of the grants to which they refer; and yet they are, with no essential distinction, the same as the case now at the bar.
In my judgment, it is perfectly clear, that any act of a legislature which takes away any powers or franchises vested by its charter in a private corporation, or its corporate officers, or which restrains or controls the legitimate exercise of them, or transfers them to other persons, without its assent, is a violation of the obligations of that charter. If the legislature mean to claim such an authority, it must be reserved in the grant. The charter of Dartmouth College contains no such reservation; and I am, therefore, bound to declare, that the acts of the legislature of New Hampshire, now in question, do impair the obligations of that charter, and are, consequently, unconstitutional and void.
In pronouncing this judgment, it has not for one moment escaped me, how delicate, difficult and ungracious is the task devolved upon us. The predicament in which this court stands in relation to the nation at large, is full of perplexities and embarrassments. It is called to decide on causes between citizens of different states, between a state and its citizens, and between different states. It stands, therefore in the midst of *jealousies [*713 and rivalries of conflicting parties, with the most momentous interests confided to its care. Under such circumstances, it never can have a *338 motive to do more than its duty; and I trust, it will always be found to possess firmness enough to do that.
Under these impressions, I have pondered on the case before us with the most anxious deliberation. I entertain great respect for the legislature, whose acts are in question. I entertain no less respect for the enlightened tribunal whose decision we are called upon to review. In the examination, I have endeavored to keep my steps super antiquas vias of the law, under the guidance of authority and principle. It is not for judges to listen to the voice of persuasive eloquence, or popular appeal. We have nothing to do, but to pronounce the law as we find it; and having done this, our justification must be left to the impartial judgment of our country.
DUVALL, Justice, dissented.[(a)]
*714] *Upon the suggestion of the plaintiff's counsel, that the defendant had died since the last term, the court ordered the judgment to be entered nunc pro tunc as of that term, as follows: 
JUDGMENT.  This cause came on to be heard, on the transcript of the record, and was argued by counsel: And thereupon, all and singular the premises being seen, and by the court now here fully understood, and *715] mature deliberation being thereupon had, *it appears to this court, that the said acts of the legislature of New Hampshire, of the 27th of June and of the 18th and 26th of December, Anno Domini 1816, in the *339 record mentioned, are repugnant to the constitution of the United States, and so not valid; and therefore, that the said superior court of judicature of the state of New Hampshire erred, in rendering judgment on the said special verdict in favor of the said plaintiffs; and that the said court ought to have rendered judgment thereon, that the said trustees recover against the said Woodward, the amount of damages found and assessed, in and by the verdict aforesaid, viz., the sum of $20,000: Whereupon, it is considered, ordered and adjudged by this court, now here, that the aforesaid judgment of the said superior court of judicature of the state of New Hampshire be, and the same hereby is, reversed and annulled: And this court, proceeding to render such judgment in the premises as the said superior court of judicature ought to have rendered, it is further considered by this court, now here, that the said trustees of Dartmouth College do recover against the said William Woodward the aforesaid sum of $20,000, with costs of suit; and it is by this court, now here, further ordered, that a special mandate do go from this court to the said superior court of judicature, to carry this judgment into execution.
NOTES
[(a)] The case of Sutton Hospital, 10 Co. 23.
[(a)] See Rex v. Pasmore, 3 T.R. 199, and the cases there cited.
[1] 2 Fonbl. Eq., B. 2, pt. 2, ch. 1, § 1, note a; Coop. Eq. Pl. 292; 2 Kyd on Corp. 195; Green v. Rutherforth, 1 Ves. 462; Attorney-General v. Foundling Hospital, 4 Bro. C.C. 165; S.C. 2 Ves. jr. 42; Eden v. Foster, 2 P. Wms. 325; 1 Wooddes. 476; Attorney-General v. Price, 3 Atk. 108; Attorney-General v. Lock, 3 Ibid. 164; Attorney-General v. Dixie, 13 Ves. 519; Ex parte Kirby Ravensworth Hospital, 15 Ibid. 304, 314; Attorney-General v. Earl of Clarendon, 17 Ibid. 491, 499; Berkhamstead Free School, 2 Ves. & B. 134; Attorney-General v. Corporation of Carmarthen, Cooper 30; Mayor, &c., of Colchester v. Lowten, 1 Ves. & B. 226; Rex v. Watson, 2 T.R. 199; Attorney-General v. Utica Ins. Co., 2 Johns. Ch. 371; Attorney-General v. Middleton, 2 Ves. 327.
[(a)] See Holmes v. Lansing, 3 Johns. Cas. 73.
[2] Starr v. Hamilton, 1 Deady 268. Co. Litt. 113 a, Harg. & Butler's note 2; Sugden on Powers 140; Jackson v. Jansen, 6 Johns. 73; Franklin v. Osgood, 2 Johns. Cas. 1; S.C. 14 Johns. 527; Zebach v. Smith, 3 Binn. 69; Lessee of Moody v. Vandyke, 4 Ibid. 7, 31; Attorney-General v. Gleg, 1 Atk. 356; 1 Bac. Abr. 586 (Gwillim's edit.).
[(a)] In the discussions which arose in France, in 1786, upon the new charter then recently granted to the French East India company, it seems to have been taken for granted, by the lawyers on both sides, to whom the questions in controversy were submitted by the company, and by the merchants who considered themselves injured by its establishment, that if the charter had regularly issued according to the forms of the French law, it was irrevocable, unless forfeited for non-user or misuser. The advocates (MM. LACRETELLE and BLONDE) who were consulted by the merchants of the kingdom opposed to the establishment of the company, denied its legal existence, on the ground, that the king had been surprised in his grant; that it was not yet perfected by the issuing of letters-patent, nor duly registered by the parliaments; and that it both might and ought to be suppressed, as an illegal grant of exclusive privileges, contrary to the true principles of commercial philosophy. On the other hand, it was contended by the company, that their grant was irrevocable; that it was but a renewal and confirmation of the charter of the old company, which had been suspended in 1769, in consequence of the immense losses of capital sustained in the calamitous war of 1756 (but which suspension was at the time solemnly protested against by the parliament of Paris as illegal); that their new grant might still be perfected by letters-patent, which the faith of the king was pledged to issue; and that the privileges thus granted to them were irrevocably vested, as a right of property, of which they could not be deprived by any authority in the kingdom. "En effet, quand le roi accorde un privilege exclusif, ce privilege est le prix d'une mise de fonds, dans un commerce hazardeux, dont Ventreprize est jugée avantageuse à.l'etat. Delà naît par conséquent un contrat synallagmatique, qui se forme entre le souverain et lès actionnaires. Delà naît un droit de propriété qui deviént inébranlable pour le souverain lui-même." And of this opinion were the advocates (MM. HARDOIN, GERBIER and DE BONNIERES) consulted by the company. See a Collection of Tracts on the French East India company, Paris, 1788. in the Library of Congress.